# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

Division 4

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 2 6 2024

CLERK, U.S. DISTRICT COURT
By _____
Deputy

Yvonne Reed
Plaintiff

v.

**4-24CV-597-P**

Civil Action No. _____

Cleigh Ryan Voorhees/FWH Apartments LLC
Defendant

## COMPLAINT

I'm filing this complaint due to a violation of Title VIII of the 1968 Civil Rights Act. I was discrimated against because of my race and my age. I was a resident of the Lone Oak Apartments located at 1801 Lone Oak Rd Weatherford, TX 76086 with an effective date of 09/30/2023. I signed my lease on 09/30/2023 and can provide a copy of the lease. I was sexually assaulted in my apartment while I was asleep. This was an inside job. There were no signs of foreced entry. However, the rapist got me pregnant as a result of the rape. I did report this incident to the police. I advised the police that I had not given the key to anyone or invited anyone into my home. I lived alone and was not romantically involved with anyone. I advised the police that the apartment personnel had given the rapist access to my apartment to come and rape me. I did move out of these apartments on 05/02/2023 as a result of the rape and not feeling safe to live there anymore. I strongly believe that the previous apartment manager Sandy Sawyer was responsible for giving the rapists access to my apartment. I spoke with the apartment manager Sandy Sawyer by phone about the rape incident on 02/15/2024 around 3 pm in the afternoon. The apartment manager stated that she would have the courtesy officer reach out to me. However, several days went by and there was no action taken on my behalf. Which lead me to believe that she was aware of the incident or took part in the incident. She was replaced  by the assitant manager Claudia Mota. I took the intiative and reached out to Freedom House, a non profit for rape victims. I spoke to them about the rape and they put me in contact with the police. I'm requesting relief in the amount of $3,000,000.

\* Attach additional pages as needed.

| | |
|---|---|
| Date | 6-20-2024 |
| Signature | *(signature)* |
| Print Name | Yvonne Reed |
| Address | 6828 Joelene Rae Drive |
| City, State, Zip | Arlington, TX 76086 |
| Telephone | 470-992-3082 |

6/19/24, 7:40 PM

Mail - Yvonne Reed - Outlook

## Follow Up about Sex Offender Living in Building 9

Yvonne Reed <yvreed96@outlook.com>
Thu 2/15/2024 9:26 PM
To:Claudia.Mota@elevateREM.com <Claudia.Mota@elevateREM.com>

Hi Claudia,

This is Yvonne Reed and I was following in up with you in writing about the conversation I had with Sandy Sawyer the manager today. We discussed a sex offender living in building 9 illegally. He already sex assaulted me and got me pregnant and has been stalking me. He is living in building 9 with some one who has a lease. However, he is not on the lease. Im waiting to hear back from the courtesy officer.



**TEXAS APARTMENT ASSOCIATION**
**M E M B E R**

# Apartment Lease Contract

*This document is currently filled out before signing.*

**This is a binding contract. Read carefully before signing.**

This Lease Contract ("Lease") is between you, the resident(s) as listed below and us. The terms "you" and "your" refer to all residents. The terms "we," "us," and "our" refer to the owner listed below.

## PARTIES

**Residents**    Yvonne Reed

**Owner**    Tzadik Lone Oak Apartments DBA Lone Oak Apartments

**Occupants**

## LEASE DETAILS

**A. Apartment (Par. 2)**
Street Address: 1829 Lone Oak Rd APT 930
Apartment No. 930    City: Weatherford    State: TX   Zip: 76086

**B. Initial Lease Term.** Begins: 09/30/2023    Ends at 11:59 p.m. on: 12/29/2024

**C. Monthly Base Rent (Par. 3)**
$ 1190.00

**D. Prorated Rent**
$ 39.67
☐ due for the remainder of 1st month or
☐ for 2nd month

**E. Security Deposit (Par. 5)**
$ 150.00

Note that this amount does not include any Animal Deposit, which would be reflected in an Animal Addendum.

**F. Notice of Termination or Intent to Move Out (Par. 4)**
A minimum of 60 days' written notice of termination or intent to move out required at end of initial Lease term or during renewal period

*If the number of days isn't filled in, notice of at least 30 days is required.*

**G. Late Fees (Par. 3.3)**

| Initial Late Fee | Daily Late Fee |
|---|---|
| ☒ 10 % of one month's monthly base rent or | ☐ _____ % of one month's monthly base rent for _____ days or |
| ☐ $ _____ | ☐ $ _____ for _____ days |
| Due if rent unpaid by 11:59 p.m. on the 3rd (3rd or greater) day of the month | |

**H. Returned Check or Rejected Payment Fee (Par. 3.4)**
$ 30.00

**I. Reletting Charge (Par. 7.1)**
A reletting charge of $ 1011.50 *(not to exceed 85% of the highest monthly Rent during the Lease term)* may be charged in certain default situations

**J. Optional Early Termination Fee (Par. 7.2)**
$ 2500.00
Notice of 60 days is required.
*You are not eligible for early termination if you are in default.*
Fee must be paid no later than 30 days after you give us notice
*If values are blank or "0," then this section does not apply.*

**K. Animal Violation Charge (Par. 12.2)**
Initial charge of $ 100.00 per animal (not to exceed $100 per animal) and

A daily charge of $ 10.00 per animal (not to exceed $10 per day per animal)

**L. Additional Rent - Monthly Recurring Fixed Charges.** You will pay separately for these items as outlined below and/or in separate addenda, Special Provisions or an amendment to this Lease.

| | | | |
|---|---|---|---|
| Animal rent | $ 30.00 | Cable/satellite $ _____ | Trash service $ 25.00 |
| Internet | $ _____ | Package service $ 6.00 | Pest control $ 2.00 |
| Storage | $ _____ | Stormwater/drainage $ _____ | Washer/Dryer $ _____ |
| Other: | | | $ _____ |
| Other: | | | $ _____ |
| Other: | | | $ _____ |
| Other: | | | $ _____ |

**M. Utilities and Other Variable Charges.** You will pay separately for gas, water, wastewater, electricity, trash/recycling, utility billing fees and other items as outlined in separate addenda, Special Provisions or an amendment to this Lease.

**Utility Connection Charge or Transfer Fee:** $ 50.00 (not to exceed $50) to be paid within 5 days of written notice (**Par. 3.5**)

**Special Provisions.** See Par. 32 or additional addenda attached. The Lease cannot be changed unless in writing and signed by you and us.

## LEASE TERMS AND CONDITIONS

1. **Definitions.** The following terms are commonly used in this Lease:

    1.1. **"Residents"** are those listed in "Residents" above who sign the Lease and are authorized to live in the apartment.

    1.2. **"Occupants"** are those listed in this Lease who are also authorized to live in the apartment, but who do not sign the Lease.

    1.3. **"Owner"** may be identified by an assumed name and is the owner only and not property managers or anyone else.

    1.4. **"Including"** in this Lease means "including but not limited to."

    1.5. **"Community Policies"** are the written apartment rules and policies, including property signage and instructions for care of our property and amenities, with which you, your occupants, and your guests must comply.

    1.6. **"Rent"** is monthly base rent plus additional monthly recurring fixed charges.

2. **Apartment.** You are leasing the apartment listed above for use as a private residence only.

    2.1. **Access.** In accordance with our Community Policies, you'll receive access information or devices for your apartment and mailbox, and other access devices including: **Access gate.**
    _____
    _____

    2.2. **Measurements.** Any dimensions and sizes provided to you relating to the apartment are only approximations or estimates; actual dimensions and sizes may vary.

    2.3. **Representations.** You agree that designations or accreditations associated with the property are subject to change.

3. **Rent.** *You must pay your Rent on or before the 1st day of each month (due date) without demand. There are no exceptions regarding the payment of Rent, and you agree not paying Rent on or before the 1st of each month is a material breach of this Lease.*

    3.1. **Payments.** You will pay your Rent by any method, manner and place we specify in accordance with our Community Policies. *Cash is not acceptable without our prior written permission. You cannot withhold or offset Rent unless authorized by law.* We may, at our option, require at any time that you pay Rent and other sums due in one single payment by any method we specify.

    3.2. **Application of Payments.** Payment of each sum due is an independent covenant, which means payments are due regardless of our performance. When we receive money, other than water and wastewater payments subject to government regulation, we may apply it at our option and without notice first to any of your unpaid obligations, then to accrued rent. We may do so regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than Rent and late fees are due upon our demand. After the due date, we do not have to accept any payments.

    3.3. **Late Fees.** If we don't receive your monthly base rent in full when it's due, you must pay late fees as outlined in Lease Details.

    3.4. **Returned Payment Fee.** You'll pay the fee listed in Lease Details for each returned check or rejected electronic payment, plus initial and daily late fees if applicable, until we receive full payment in an acceptable method.

    3.5. **Utilities and Services.** You'll pay for all utilities and services, related deposits, and any charges or fees when they are due and as outlined in this Lease. Television channels that are provided may be changed during the Lease term if the change applies to all residents.

    If your electricity is interrupted, you must use only battery-operated lighting (no flames). You must not allow any utilities (other than cable or Internet) to be cut off or switched for any reason—including disconnection for not paying your bills—until the Lease term or renewal period ends. If a utility is individually metered, it must be connected in your name and you must notify the provider of your move-out date. If you delay getting service turned on in your name by the Lease's start date or cause it to be transferred back into our name before you surrender or abandon the apartment, you'll be liable for the charge listed above (not to exceed $50 per billing period), plus the actual or estimated cost of the utilities used while the utility should have been billed to you. If your apartment is individually metered and you change your retail electric provider, you must give us written notice. You must pay all applicable provider fees, including any fees to change service back into our name after you move out.

    3.6. **Lease Changes.** Lease changes are only allowed during the Lease term or renewal period if governed by Par. 10, specified in Special Provisions in Par. 32, or by a written addendum or amendment signed by you and us. At or after the end of the initial Lease term, Rent increases will become effective with at least 5 days plus the number of days' advance notice contained in Box F on page 1 in writing from us to you. Your new Lease, which may include increased Rent or Lease changes, will begin on the date stated in any advance notice we provide (without needing your signature) unless you give us written move-out notice under Par. 25, which applies only to the end of the current Lease term or renewal period.

4. **Automatic Lease Renewal and Notice of Termination.** This Lease will automatically renew month-to-month unless either party gives written notice of termination or intent to move out as required by Par. 25 and specified on page 1. *If the number of days isn't filled in, notice of at least 30 days is required.*

5. **Security Deposit.** The total security deposit for all residents is due on or before the date this Lease is signed. Any animal deposit will be designated in an animal addendum. Security deposits may not be applied to Rent without our prior written consent.

    5.1. **Refunds and Deductions.** <mark>You must give us your advance notice of move out as provided by Par. 25 and forwarding address in writing to receive a written description and itemized list of charges or refund. In accordance with our Community Policies and as allowed by law, we may deduct from your security deposit any amounts due under the Lease. If you move out early or in response to a notice to vacate, you'll be liable for rekeying charges.</mark> Upon receipt of your move-out date and forwarding address in writing, the security deposit will be returned (less lawful deductions) with an itemized accounting of any deductions, no later than 30 days after surrender or abandonment, unless laws provide otherwise. Any refund may be by one payment jointly payable to all residents and distributed to any one resident we choose, or distributed equally among all residents.

6. **Insurance.** *Our insurance doesn't cover the loss of or damage to your personal property.* You will be required to have liability insurance as specified in our Community Policies or Lease addenda unless otherwise prohibited by law. If you have insurance covering the apartment or your personal belongings at the time you or we suffer or allege a loss, you agree to require your insurance carrier to waive any insurance subrogation rights. Even if not required, we urge you to obtain your own insurance for losses due to theft, fire, flood, water, pipe leaks and similar occurrences. Most renter's insurance policies don't cover losses due to a flood.

7. **Reletting and Early Lease Termination.** This Lease may not be terminated early except as provided in this Lease.

    7.1. **Reletting Charge.** You'll be liable for a reletting charge as listed in Lease Details, (not to exceed 85% of the highest monthly Rent during the Lease term) if you: (A) fail to move in, or fail to give written move-out notice as required in Par. 25; (B) move out without paying Rent in full for the entire Lease term or renewal period; (C) move out on our demand because of your default; or (D) are judicially evicted. The reletting charge is not a termination, cancellation or buyout fee and does not release you from your obligations under this Lease, including liability for future or past-due Rent, charges for damages or other sums due.

    The reletting charge is a liquidated amount covering only part of our damages—for our time, effort, and expense in finding and processing a replacement resident. These damages are uncertain and hard to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of our damages and that the charge is due whether or not our reletting attempts succeed.

    7.2. **Early Lease Termination Procedures.** In addition to your termination rights referred to in 7.3 or 8.1 below, if this provision applies under Lease Details, you may terminate the Lease prior to the end of the Lease term *if all of the following occur:* (a) as outlined in Lease Details, you give us written notice of early termination, pay the early termination fee and specify the date by which you'll move out; (b) you are not in default at any time and do not hold over; and (c) you repay all rent concessions, credits or discounts you received during the Lease term. If you are in default, the Lease remedies apply.

    7.3. **Special Termination Rights.** *You may have the right under Texas law to terminate the Lease early in certain situations involving military deployment or transfer, family violence, certain sexual offenses, stalking or death of a sole resident.*

8. **Delay of Occupancy.** We are not responsible for any delay of your occupancy caused by construction, repairs, cleaning, or a previous resident's holding over. This Lease will remain in force subject to (1) abatement of Rent on a daily basis during delay, *and* (2) your right to terminate the Lease in writing as set forth below. Rent abatement and Lease termination do not apply if the delay is for cleaning or repairs that don't prevent you from moving into the apartment.

    8.1. **Termination.** If we give written notice to you of a delay in occupancy when or after the Lease begins, you may terminate the Lease within 3 days after you receive written notice.

    If we give you written notice before the date the Lease begins and the notice states that a construction or other delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease within 7 days after receiving written notice.

    After proper termination, you are entitled only to refund of any deposit(s) and any Rent you paid.

**9.** **Care of Unit and Damages.** You must promptly pay or reimburse us for loss, damage, consequential damages, government fines or charges, or cost of repairs or service in the apartment community because of a Lease or Community Policies violation; improper use, negligence, or other conduct by you, your invitees, your occupants, or your guests; or, as allowed by law, any other cause not due to our negligence or fault, except for damages by acts of God to the extent they couldn't be mitigated by your action or inaction.

*Unless damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs and replacements occurring during the Lease term or renewal period, including: (A) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment; (B) damage to doors, windows, or screens; and (C) damage from windows or doors left open.*

## RESIDENT LIFE

**10.** **Community Policies.** *Community Policies become part of the Lease and must be followed.* We may make changes, including additions, to our written Community Policies, and those changes can become effective immediately if the Community Policies are distributed and applicable to all units in the apartment community and do not change the dollar amounts in Lease Details.

**10.1.** **Photo/Video Release.** You give us permission to use any photograph, likeness, image or video taken of you while you are using property common areas or participating in any event sponsored by us.

**10.2.** **Disclosure of Information.** At our sole option, we may, but are not obligated to, share and use information related to this Lease for law-enforcement, governmental, or business purposes. At our request, you authorize any utility provider to give us information about pending or actual connections or disconnections of utility service to your apartment.

**10.3.** **Guests.** We may exclude from the apartment community any guests or others who, in our sole judgment, have been violating the law, violating this Lease or our Community Policies, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area anyone who refuses to show photo identification or refuses to identify himself or herself as a resident, an authorized occupant, or a guest of a specific resident in the community.

Anyone not listed in this Lease cannot stay in the apartment for more than ___3___ days in one week without our prior written consent, and no more than twice that many days in any one month. If the previous space isn't filled in, 2 days total per week will be the limit.

**10.4.** **Notice of Convictions and Registration.** You must notify us within 15 days if you or any of your occupants: (A) are convicted of any felony, (B) are convicted of any misdemeanor involving a controlled substance, violence to another person, or destruction of property, or (C) register as a sex offender. Informing us of a criminal conviction or sex-offender registration doesn't waive any rights we may have against you.

**10.5.** **Odors and Noise.** You agree that odors, smoke and smells including those related to cooking and everyday noises or sounds are all a normal part of a multifamily living environment and that it is impractical for us to prevent them from penetrating your apartment.

**11.** **Conduct.** You agree to communicate and conduct yourself in a lawful, courteous and reasonable manner at all times when interacting with us, our representatives and other residents or occupants. Any acts of unlawful, discourteous or unreasonable communication or conduct by you, your occupants or guests is a breach of this Lease.

You must use customary diligence in maintaining the apartment, keeping it in a sanitary condition and not damaging or littering the common areas. Trash must be disposed of at least weekly. You will use your apartment and all other areas, including any balconies, with reasonable care. We may regulate the use of passageways, patios, balconies, porches, and activities in common areas.

**11.1.** **Prohibited Conduct.** You, your occupants, and your guests will not engage in certain prohibited conduct, including the following activities:

(a) criminal conduct; manufacturing, delivering, or possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; or, except when allowed by law, displaying or possessing a gun, knife, or other weapon in the common area, or in a way that may alarm others;

(b) behaving in a loud, obnoxious or dangerous manner;

(c) disturbing or threatening the rights, comfort, health, safety, or convenience of others, including us, our agents, or our representatives;

(d) disrupting our business operations;

(e) storing anything in closets containing water heaters or gas appliances;

(f) tampering with utilities or telecommunication equipment;

(g) bringing hazardous materials into the apartment community;

(h) using windows for entry or exit;

(i) heating the apartment with gas-operated appliances;

(j) making bad-faith or false allegations against us or our agents to others;

(k) smoking of any kind, that is not in accordance with our Community Policies or Lease addenda;

(l) using glass containers in or near pools; or

(m) conducting any kind of business (including child-care services) in your apartment or in the apartment community—except for any lawful business conducted "at home" by computer, mail, or telephone if customers, clients, patients, employees or other business associates do not come to your apartment for business purposes.

**12.** **Animals.** *No living creatures of any kind are allowed, even temporarily, anywhere in the apartment or apartment community unless we've given written permission.* If we allow an animal, you must sign a separate Animal Addendum and, except as set forth in the addendum, pay an animal deposit and applicable fees and additional monthly rent, as applicable. An animal deposit is considered a general security deposit. You represent that any requests, statements and representations you make, including those for an assistance or support animal, are true, accurate and made in good faith. Feeding stray, feral or wild animals is a breach of this Lease.

**12.1.** **Removal of Unauthorized Animal.** We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, a written notice of our intent to remove the animal within 24 hours; and (2) following the procedures of Par. 14. We may: keep or kennel the animal; turn the animal over to a humane society, local authority or rescue organization; or return the animal to you if we consent to your request to keep the animal and you have completed and signed an Animal Addendum and paid all fees. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. You must pay for the animal's reasonable care and kenneling charges.

**12.2.** **Violations of Animal Policies and Charges.** If you or any guest or occupant violates the animal restrictions of this Lease or our Community Policies, you'll be subject to charges, damages, eviction, and other remedies provided in this Lease, including animal violation charges listed in Lease Details from the date the animal was brought into your apartment until it is removed. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for all cleaning and repair costs, including defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead in enforcing animal restrictions and Community Policies.

**13.** **Parking.** You may not be guaranteed parking. We may regulate the time, manner, and place of parking of all motorized vehicles and other modes of transportation, including bicycles and scooters, in our Community Policies. In addition to other rights we have to tow or boot vehicles under state law, we also have the right to remove, at the expense of the vehicle owner or operator, any vehicle that is not in compliance with our Community Policies.

**14.** **When We May Enter.** If you or any other resident, guest or occupant is present, then repair or service persons, contractors, law officers, government representatives, lenders, appraisers, prospective residents or buyers, insurance agents, persons authorized to enter under your rental application, or our representatives may peacefully enter the apartment at reasonable times for reasonable business purposes. If nobody is in the apartment, then any such person may enter peacefully and at reasonable times (by breaking a window or other means when necessary) for reasonable business purposes if written notice of the entry is left in a conspicuous place in the apartment immediately after the entry. We are under no obligation to enter only when you are present, and we may, but are not obligated to, give prior notice or make appointments.

**15. Requests, Repairs and Malfunctions.**

**15.1. Written Requests Required.** *If you or any occupant needs to send a request—for example, for repairs, installations, services, ownership disclosure, or security-related matters—it must be written and delivered to our designated representative in accordance with our Community Policies* (except for fair-housing accommodation or modification requests or situations involving imminent danger or threats to health or safety, such as fire, smoke, gas, explosion, or crime in progress). Our written notes regarding your oral request do not constitute a written request from you. Our complying with or responding to any oral request doesn't waive the strict requirement for written notices under this Lease. A request for maintenance or repair by anyone residing in your apartment constitutes a request from all residents. *The time, manner, method and means of performing maintenance and repairs, including whether or which vendors to use, are within our sole discretion.*

**15.2. Your Requirement to Notify.** You must promptly notify us in writing of air conditioning or heating problems, water leaks or moisture, mold, electrical problems, malfunctioning lights, broken or missing locks or latches, or any other condition that poses a hazard or threat to property, health, or safety. Unless we instruct otherwise, you are required to keep the apartment cooled or heated according to our Community Policies. Air conditioning problems are normally not emergencies.

**15.3. Utilities.** We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to perform work or to avoid property damage or other emergencies. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately.

**15.4. Your Remedies.** We'll act with customary diligence to make repairs and reconnections within a reasonable time, taking into consideration when casualty-insurance proceeds are received. Unless required by statute after a casualty loss, or during equipment repair, your Rent will not abate in whole or in part. "Reasonable time" accounts for the severity and nature of the problem and the reasonable availability of materials, labor, and utilities. *If we fail to timely repair a condition that materially affects the physical health or safety of an ordinary resident as required by the Texas Property Code, you may be entitled to exercise remedies under § 92.056 and § 92.0561 of the Texas Property Code. If you follow the procedures under those sections, the following remedies, among others, may be available to you: (1) termination of the Lease and an appropriate refund under 92.056(f); (2) have the condition repaired or remedied according to § 92.0561; (3) deduct from the Rent the cost of the repair or remedy according to § 92.0561; and 4) judicial remedies according to § 92.0563.*

**16. Our Right to Terminate for Apartment Community Damage or Closure.** If, in our sole judgment, damages to the unit or building are significant or performance of needed repairs poses a danger to you, we may terminate this Lease and your right to possession by giving you at least 7 days' written notice. If termination occurs, your lease we'll refund only prorated rent and all deposits, minus lawful deductions. We may remove your personal property if, in our sole judgment, it causes a health or safety hazard or impedes our ability to make repairs.

**16.1. Property Closure.** We also have the right to terminate this Lease and your right to possession by giving you at least 30 days' written notice of termination if we are demolishing your apartment or closing it and it will no longer be used for residential purposes for at least 6 months, or if any part of the property becomes subject to an eminent domain proceeding.

**17. Assignments and Subletting.** You may not assign this Lease or sublet your apartment. You agree that you won't rent, offer to rent or license all or any part of your apartment to anyone else unless otherwise agreed to in advance by us in writing. You agree that you won't accept anything of value from anyone else for the use of any part of your apartment. You agree not to list any part of your apartment on any lodging or short-term rental website or with any person or service that advertises dwellings for rent.

**18. Security and Safety Devices. We'll pay for missing security devices that are required by law. You'll pay for: (A) rekeying that you request (unless we failed to rekey after the previous resident moved out); and (B) repairs or replacements because of misuse or damage by you or your family, your occupants, or your guests.** You must pay immediately after the loss unless state law authorizes advance payment. You must also pay in advance for any additional or changed security devices you request.

*Texas Property Code secs. 92.151, 92.153, and 92.154 require, with some exceptions, that we provide at no cost to you when occupancy begins: (A) a window latch on each window; (B) a doorviewer (peephole or window) on each exterior door; (C) a pin lock on each sliding door; (D) either a door-handle latch or a security bar on each sliding door; (E) a keyless bolting device (deadbolt) on each exterior door; and (F) either a keyed doorknob lock or a keyed deadbolt lock on one entry door. Keyed locks will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in, as required by law. If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next Rent payment under Texas Property Code sec. 92.165(1). We may deactivate or not install keyless bolting devices on your doors if (A) you or an occupant in the dwelling is over 55 or disabled, and (B) the requirements of Texas Property Code sec. 92.153(a) or (f) are satisfied.*

**18.1. Smoke Alarms and Detection Devices.** We'll furnish smoke alarms or other detection devices required by law or city ordinance. We may install additional detectors not so required. We'll test them and provide working batteries when you first take possession of your apartment. Upon request, we'll provide, as required by law, a smoke alarm capable of alerting a person with a hearing impairment.

You must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. Neither you nor your guests or occupants may disable alarms or detectors. *If you damage or disable the smoke alarm or remove a battery without replacing it with a working battery, you may be liable to us under Texas Property Code sec. 92.2611 for $100 plus one month's Rent, actual damages, and attorney's fees.*

**18.2. Duty to Report.** You must immediately report to us any missing, malfunctioning or defective security devices, smoke alarms or detectors. You'll be liable if you fail to report malfunctions, or fail to report any loss, damage, or fines resulting from fire, smoke, or water.

**19. Resident Safety and Loss.** *Unless otherwise required by law, none of us, our employees, agents, or management companies are liable to you, your guests or occupants for any damage, personal injury, loss to personal property, or loss of business or personal income, from any cause, including but not limited to negligent or intentional acts of residents, occupants, or guests; theft, burglary, assault, vandalism or other crimes; fire, flood, water leaks, rain, hail, ice, snow, smoke, lightning, wind, explosions, interruption of utilities, pipe leaks or other occurrences unless such damage, injury or loss is caused exclusively by our negligence.*

*We do not warrant security of any kind.* You agree that you will not rely upon any security measures taken by us for personal security, and that you will call 911 and local law enforcement authorities if any security needs arise.

You acknowledge that we are not equipped or trained to provide personal security services to you, your guests or occupants. You recognize that we are not required to provide any private security services and that no security devices or measures on the property are fail-safe. You further acknowledge that, even if an alarm or gate amenities are provided, they are mechanical devices that can malfunction. Any charges resulting from the use of an intrusion alarm will be charged to you, including, but not limited to, any false alarms with police/fire/ambulance response or other required city charges.

**20. Condition of the Premises and Alterations.**

**20.1. As-Is. *We disclaim all implied warranties.*** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. You'll be given an Inventory and Condition Form at or before move-in. You agree that after completion of the form or within 48 hours after move-in, whichever comes first, you must note on the form all defects or damage, sign the form, return it to us, and the form accurately reflects the condition of the premises for purposes of determining any refund due to you when you move out. Otherwise, everything will be considered to be in a clean, safe, and good working condition. You must still send a separate request for any repairs needed as provided by Par. 15.1.

**20.2. Standards and Improvements.** Unless authorized by law or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. Unless our Community Policies state otherwise, we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls. No water furniture, washing machines, dryers, extra phone or television outlets, alarm systems,

cameras, video or other doorbells, or lock changes, additions, or rekeying is permitted unless required by law or we've consented in writing. You may install a satellite dish or antenna, but only if you sign our satellite-dish or antenna lease addendum, which complies with reasonable restrictions allowed by federal law. You must not alter, damage, or remove our property, including alarm systems, detection devices, appliances, furniture, telephone and television wiring, screens, locks, or security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (made with or without our consent) become ours unless we agree otherwise in writing.

**21. Notices.** Written notice to or from our employees, agents, or management companies constitutes notice to or from us. Notices to you or any other resident of the apartment constitute notice to all residents. Notices and requests from any resident constitute notice from all residents. Only residents can give notice of Lease termination and intent to move out under Par. 7.3. All notices and documents will be in English and, at our option, in any other language that you read or speak.

**21.1. Electronic Notice.** Notice may be given electronically *by us to you* if allowed by law. If allowed by law and in accordance with our Community Policies, electronic notice *from you to us* must be sent to the email address and/or portal specified in Community Policies. Notice may also be given by phone call or to a physical address if allowed in our Community Policies.

You represent that you have provided your current email address to us, and that you will notify us in the event your email address changes.

**EVICTION AND REMEDIES**

**22. Liability.** Each resident is jointly and severally liable for all Lease obligations. If you or any guest or occupant violates the Lease or our Community Policies, all residents are considered to have violated the Lease.

**22.1. Indemnification by You.** *You'll defend, indemnify and hold us and our employees, agents, and management company harmless from all liability arising from your conduct or requests to our representatives and from the conduct of or requests by your invitees, occupants or guests.*

**23. Default by Resident.**

**23.1. Acts of Default.** You'll be in default if: (A) you don't timely pay Rent, including monthly recurring charges, or other amounts you owe; (B) you or any guest or occupant violates this Lease, our Community Policies, or fire, safety, health, criminal or other laws, regardless of whether or where arrest or conviction occurs; (C) you give incorrect, incomplete, or false answers in a rental application or in this Lease; or (D) you or any occupant is charged, detained, convicted, or given deferred adjudication or pretrial diversion for (1) an offense involving actual or potential physical harm to a person, or involving the manufacture or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in the Texas Controlled Substances Act, or (2) any sex-related crime, including a misdemeanor.

**23.2. Eviction.** *If you default, including holding over, we may end your right of occupancy by giving you at least a 24-hour written notice to vacate.* Termination of your possession rights doesn't release you from liability for future Rent or other Lease obligations. *After giving notice to vacate or filing an eviction suit, we may still accept Rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right.* Accepting money at any time doesn't waive our right to damages, to past or future Rent or other sums, or to our continuing with eviction proceedings. In an eviction, Rent is owed for the full rental period and will not be prorated.

**23.3. Acceleration.** Unless we elect not to accelerate Rent, all monthly Rent for the rest of the Lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due if, without our written consent: (A) you move out, remove property in preparing to move out, or you or any occupant gives oral or written notice of intent to move out before the Lease term or renewal period ends; and (B) you haven't paid all Rent for the entire Lease term or renewal period. Remaining Rent will also be accelerated if you're judicially evicted or move out when we demand because you've defaulted.

If you don't pay the first month's Rent when or before the Lease begins, all future Rent for the Lease term will be automatically accelerated without notice and become immediately due. We also may end your right of occupancy and recover damages, future Rent, attorney's fees, court costs, and other lawful charges.

**23.4. Holdover.** You and all occupants must vacate and surrender the apartment by or before the date contained in: (1) your move-out notice (2) our notice to vacate, (3) our notice of non-renewal, or (4) a written agreement specifying a different move-out date. If a holdover occurs, then you'll be liable to us for all Rent for the full term of the previously signed lease of a new resident who can't occupy because of the holdover, and at our option, we may extend the Lease term and/or increase the Rent by 25% by delivering written notice to you or your apartment while you continue to hold over.

**23.5. Other Remedies.** We may report unpaid amounts to credit agencies as allowed by law. If we or our debt collector tries to collect any money you owe us, you agree that we or the debt collector may contact you by any legal means. If you default, you will pay us, in addition to other sums due, any rental discounts or concessions agreed to in writing that have been applied to your account. We may recover attorney's fees in connection with enforcing our rights under this Lease. All unpaid amounts you owe bear interest at the rate provided by Texas Finance Code Section 304.003(c) from the due date. You must pay all collection-agency fees if you fail to pay sums due within 10 days after you are mailed a letter demanding payment and stating that collection-agency fees will be added if you don't pay all sums by that deadline. You are also liable for a charge (not to exceed $150) to cover our time, cost and expense for any eviction proceeding against you, plus our attorney's fees and expenses, court costs, and filing fees actually paid.

**24. Representatives' Authority and Waivers.** *Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease or any part of it unless in writing and signed, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives, unless in writing and signed.* No action or omission by us will be considered a waiver of our rights or of any subsequent violation, default, or time or place of performance. *Our choice to enforce, not enforce or delay enforcement of written-notice requirements, rental due dates, acceleration, liens, or any other rights isn't a waiver under any circumstances.* Delay in demanding sums you owe is not a waiver. Except when notice or demand is required by law, you waive any notice and demand for performance from us if you default. Nothing in this Lease constitutes a waiver of our remedies for a breach under your prior lease that occurred before the Lease term begins. Your Lease is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise.

All remedies are cumulative. Exercising one remedy won't constitute an election or waiver of other remedies. All provisions regarding our nonliability or nonduty apply to our employees, agents, and management companies. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.

**END OF THE LEASE TERM**

**25. Move-Out Notice.** *Before moving out, you must give our representative advance written move-out notice as stated in Par. 4, even if the Lease has become a month-to-month lease.* The move-out date can't be changed unless we and you both agree in writing.

*Your move-out notice must comply with each of the following:*

(a) Unless we require more than 30 days' notice, if you give notice on the first day of the month you intend to move out, move out will be on the last day of that month.

(b) Your move-out notice must not terminate the Lease before the end of the Lease term or renewal period.

(c) If we require you to give us more than 30 days' written notice to move out before the end of the Lease term, we will give you 1 written reminder not less than 5 days nor more than 90 days before your deadline for giving us your written move-out notice. If we fail to give a reminder notice, 30 days' written notice to move out is required.

(d) You must get from us a written acknowledgment of your notice.

**26. Move-Out Procedures.**

**26.1. Cleaning.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charges for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

**26.2. Move-Out Inspection.** We may, but are not obligated to, provide a joint move-out inspection. Our representatives have no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final accounting or refunding.

**27. Surrender and Abandonment.** You have **surrendered** the apartment when: (A) the move-out date has passed and no one is living in the apartment in our reasonable judgment; **or** (B) apartment keys and access devices listed in Par. 2.1 have been turned in to us—whichever happens first.

You have **abandoned** the apartment when all of the following have occurred: (A) everyone appears to have moved out in our reasonable judgment; (B) you've been in default for nonpayment of Rent for 5 consecutive days, or water, gas, or electric service for the apartment not connected in our name has been terminated or transferred; **and** (C) you've not responded for 2 days to our notice left on the inside of the main entry door stating that we consider the apartment abandoned. An apartment is also considered abandoned 10 days after the death of a sole resident.

**27.1. The Ending of Your Rights.** Surrender, abandonment, or judicial eviction ends your right of possession for all purposes and gives us the immediate right to clean up, make repairs in, and relet the apartment; determine any security-deposit deductions; and remove or store property left in the apartment.

**27.2. Removal and Storage of Property.** We, or law officers, may—but have no duty to—remove or store all property that in our sole judgment belongs to you and remains in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) after you're judicially evicted or if you surrender or abandon the apartment.

**We're not liable for casualty, loss, damage, or theft.** You must pay reasonable charges for our packing, removing and storing any property.

Except for animals, we may throw away or give to a charitable organization all personal property that is:

(1) left in the apartment after surrender or abandonment; **or**

(2) left outside more than 1 hour after writ of possession is executed, following judicial eviction.

An animal removed after surrender, abandonment, or eviction may be kenneled or turned over to a local authority, humane society, or rescue organization.

## GENERAL PROVISIONS AND SIGNATURES

**28. TAA Membership.** We, the management company representing us, or any locator service that you used confirms membership in good standing of both the Texas Apartment Association and the affiliated local apartment association for the area where the apartment is located at the time of signing this Lease. If not, the following applies: (A) this Lease is voidable at your option and is unenforceable by us (except for property damages); and (B) we may not recover past or future rent or other charges. The above remedies also apply if both of the following occur: (1) the Lease is automatically renewed on a month-to-month basis more than once after membership in TAA and the local association has lapsed; and (2) neither the owner nor the management company is a member of TAA and the local association during the third automatic renewal. A signed affidavit from the affiliated local apartment association attesting to nonmembership when the Lease or renewal was signed will be conclusive evidence of nonmembership. Governmental entities may use TAA forms if TAA agrees in writing.

Name, address and telephone number of locator service (if applicable):

_____

_____

_____

**29. Severability and Survivability.** If any provision of this Lease is invalid or unenforceable under applicable law, it won't invalidate the remainder of the Lease or change the intent of the parties. **Paragraphs 10.1, 10.2, 16, 27 and 31 shall survive the termination of this Lease.** This Lease binds subsequent owners.

**30. Controlling Law.** Texas law governs this Lease. All litigation arising under this Lease and all Lease obligations must be brought in the county, and precinct if applicable, where the apartment is located.

**31. Waivers.** By signing this Lease, you agree to the following:

**31.1. Class Action Waiver.** You agree that you will not participate in any class action claims against us or our employees, agents, or management company. You must file any claim against us individually, and **you expressly waive your right to bring, represent, join or otherwise maintain a class action, collective action or similar proceeding against us in any forum.**

**YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU COULD BE A PARTY IN A CLASS ACTION LAWSUIT. BY SIGNING THIS LEASE, YOU ACCEPT THIS WAIVER AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE.**

**31.2. Force Majeure.** If we are prevented from completing substantial performance of any obligation under this Lease by occurrences that are beyond our control, including but not limited to, an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage or governmental regulation, then we shall be excused from any further performance of obligations to the fullest extent allowed by law.

**32. Special Provisions.** The following, or attached Special Provisions and any addenda or Community Policies provided to you, are part of this Lease and supersede any conflicting provisions in this Lease.

Rent amount in paragraph 6 does not include rentable items such as garages and carports. Upon expiration of this lease, month-to-month charges will become effective in the amount of $300 per month + rent will increase to current market rent. A one-time water activation fee of $5 will be applied. You are required to have your carpet professionally cleaned at move out and provide a receipt. Trash violations are $25 per bag.

_____

_____

_____

_____

_____

_____

_____

_____

**Before submitting a rental application or signing this Lease, you should review the documents and may consult an attorney. You are bound by this Lease when it is signed. An electronic signature is binding. This Lease is the entire agreement between you and us. You are NOT relying on any oral representations.**

**Resident or Residents** (all sign below)

_____
(Name of Resident)                    Date signed

_____
(Name of Resident)                    Date signed

_____
(Name of Resident)                    Date signed

_____
(Name of Resident)                    Date signed

_____
(Name of Resident)                    Date signed

_____
(Name of Resident)                    Date signed

**Owner or Owner's Representative** (signing on behalf of owner)

_____

FLOOD DISCLOSURE NOTICE

In accordance with Texas law, we are providing the following flood disclosure:

- We ☐ are or ☒ are not aware that the unit you are renting is located in a 100-year floodplain. If neither box is checked, you should assume the unit is in a 100-year floodplain. Even if the unit is not in a 100-year floodplain, the unit may still be susceptible to flooding. The Federal Emergency Management Agency (FEMA) maintains a flood map on its Internet website that is searchable by address, at no cost, to determine if a unit is located in a flood hazard area. Most renter's insurance policies do not cover damages or loss incurred in a flood. You should seek insurance coverage that would cover losses caused by a flood.

- We ☐ are or ☒ are not aware that the unit you are renting has flooded (per the statutory definition below) at least once within the last five years.

  *As defined in Texas Property Code 92.0135(a)(2), "flooding" means "a general or temporary condition of a partial or complete inundation of a dwelling caused by: (A) the overflow of inland or tidal waters; (B) the unusual and rapid accumulation of runoff or surface waters from any established water source such as a river, stream, or drainage ditch; or (C) excessive rainfall."*

Signatures of All Residents                    Signature of Owner or Owner's Representative

-------------------------------------          -------------------------------------

-------------------------------------

-------------------------------------          -------------------------------------
                                                              Date
-------------------------------------

-------------------------------------

-------------------------------------

Texas Apartment Association

[7] *Yvonne A Reed*      [35] *Sandey Sawyer*

# Bed Bug Addendum

**TEXAS APARTMENT ASSOCIATION**
**M  E  M  B  E  R**

> *Please note: We want to maintain a high-quality living environment for you. It's important to work together to minimize the potential for bed bugs in your dwelling and others. This addendum outlines your responsibility and potential liability when it comes to bed bugs. It also gives you some important information about them.*

1. **Addendum.** This is an addendum to the Lease Contract that you, the resident or residents, signed on the dwelling you have agreed to rent. That dwelling is:

Apt. # _____930_____ at **Tzadik Lone Oak**
**Apartments DBA Lone Oak Apartments**
_____
_____
_____
*(name of apartments)*
or other dwelling located at _____
_____
_____ *(street address of house, duplex, etc.)*
_____ *(city)*
_____ *(state)* _____ *(zip)*.

2. **Purpose.** This addendum modifies the Lease Contract to address any infestation of bed bugs (Cimex lectularius) that might be found in the dwelling or on your personal property. We will rely on representations that you make to us in this addendum.

3. **Inspection and Infestations.** We are not aware of any current evidence of bed bugs or bed-bug infestation in the dwelling.

   **BY SIGNING THIS ADDENDUM, YOU REPRESENT THAT:**
   - **YOU HAVE INSPECTED THE DWELLING BEFORE MOVING IN OR SIGNING THIS ADDENDUM, AND YOU DID NOT FIND ANY EVIDENCE OF BED BUGS OR BED-BUG INFESTATIONS, OR**
   - **YOU WILL INSPECT THE DWELLING WITHIN 48 HOURS AFTER MOVING IN OR SIGNING THIS ADDENDUM AND WILL NOTIFY US OF ANY BED BUGS OR BED-BUG INFESTATION.**

   You represent and agree that you have read the information about bed bugs provided by us and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property and possessions and that you have fully disclosed to us any previous bed-bug infestation or issue that you have experienced.

   If you disclose a previous experience of bed-bug infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs.

4. **Access for Inspection and Pest Treatment.** You must allow us and our pest-control agents access to the dwelling at reasonable times to inspect for or treat bed bugs. You and your family members, occupants, guests, and invitees must cooperate and not interfere with inspections or treatments. We have the right to select any licensed pest-control professional to treat the dwelling and building. We can select the method of treating the dwelling, building, and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation, even if those dwellings are not the source or cause of the known infestation. Simultaneously as we treat the dwelling, you must, at your expense, have your personal property, furniture, clothing, and possessions treated according to accepted treatment methods by a licensed pest-control firm that we approve. If you fail to do so, you will be in default and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed-bug infestation on your own.

5. **Notification.** You must promptly notify us:
   - of any known or suspected bed-bug infestation or presence in the dwelling, or in any of your clothing, furniture, or personal property;
   - of any recurring or unexplained bites, stings, irritations, or sores on the skin or body that you believe are caused by bed bugs, or by any condition or pest you believe is in the dwelling; *AND*
   - if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or if you receive any confirmation of bed-bug presence by a licensed pest-control professional or other authoritative source.

6. **Cooperation.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest-control agents to treat and eliminate them. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned before we treat the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing, and personal belongings so we can perform pest-control services. If you don't cooperate with us, you will be in default and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

7. **Responsibilities.** You may be required to pay all reasonable costs of cleaning and pest-control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you move out, you may be responsible for the cost of cleaning and pest control. If we have to move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may have to pay any lost rental income and other expenses we incur to relocate the neighboring residents and to clean and perform pest-control treatments to eradicate infestations in other dwellings. If you don't pay us for any costs you are liable for, you will be in default and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and we may take immediate possession of the dwelling. If you don't move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

8. **Transfers.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest-control professional. You must provide proof of such cleaning and treatment to our satisfaction.

---

**You are legally bound by this document. Please read it carefully.**

| Resident or Residents *(all sign below)* | Owner or Owner's Representative *(sign below)* |
|---|---|

_____ _____
*(Name of Resident)*                     *Date signed*                           *Date signed*

_____
*(Name of Resident)*                     *Date signed*

_____
*(Name of Resident)*                     *Date signed*

_____
*(Name of Resident)*                     *Date signed*

_____
*(Name of Resident)*                     *Date signed*

_____
*(Name of Resident)*                     *Date signed*

*You are entitled to receive a copy of this Addendum after it is fully signed. Keep it in a safe place.*

©2019 TEXAS APARTMENT ASSOCIATION, INC.

CONTINUED ON BACK

# Bed Bugs

## A Guide for Rental-Housing Residents

*(Adapted with permission from the National Apartment Association)*

Bed bugs are wingless, flat, broadly oval-shaped insects, with a typical lifespan of 6 to 12 months. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

## Bed bugs don't discriminate.

Bed bugs' increased presence across the United States in recent decades is due largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental-housing residents, out of shame, to avoid notifying owners of their presence. This only causes the bed bugs to spread.

While bed bugs are more attracted to clutter, they're certainly not discouraged by cleanliness. Bottom line: bed bugs know no social or economic bounds; claims to the contrary are false.

## Bed bugs don't transmit disease.

There exists no scientific evidence that bed bugs carry disease. In fact, federal agencies tasked with addressing pests of public-health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease-carrying pests. Again, claims associating bed bugs with disease are false.

## Learn to identify bed bugs.

Bed bugs can often be found in, around, behind, under, or between:
- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Window and door frames
- Ceiling and wall junctions
- Crown moldings
- Wall hangings and loose wallpaper
- Carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Electronic devices, such as smoke and carbon-monoxide detectors

Because bed bugs leave some people with itchy welts similar to those made by fleas and mosquitoes, the cause of welts like that often go misdiagnosed. One distinguishing sign is that bed-bug marks often appear in succession on exposed areas of the skin such as the face, neck, and arms. But sometimes a person has no visible reaction at all from direct contact with bed bugs.

While bed bugs typically act at night, they often leave signs of their presence through fecal markings of a red to dark-brown color, visible on or near beds. Blood stains also tend to appear when the bugs have been squashed, usually by an unsuspecting sleeping host. And because they shed, it's not uncommon to find the skin casts they leave behind.

## Prevent bed-bug encounters when traveling.

Because humans serve as bed bugs' main mode of transportation, it's especially important to be mindful of bed bugs when away from home. Experts attribute the spread of bed bugs across all regions of the United States largely to increases in travel and trade, both here and abroad. So travelers are encouraged to take a few minutes on arriving to thoroughly inspect their accommodations before unpacking. Because bed bugs can easily travel from one place to another, it's also a good practice to thoroughly inspect luggage and belongings for bed bugs before heading home.

## Know the bed-bug dos and don'ts.

- Don't bring used furniture from unknown sources into your dwelling. Countless bed-bug infestations have stemmed directly from bringing home second-hand and abandoned furniture. Unless you are absolutely sure that a piece of second-hand furniture is bed-bug-free, you should assume that a seemingly nice looking leather couch, for example, is sitting curbside waiting to be hauled off to the landfill because it's teeming with bed bugs.
- Do inspect rental furniture, including mattresses and couches, for the presence of bed bugs before moving it into your dwelling.
- Do address bed-bug sightings immediately. Rental-housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- Don't try to treat bed-bug infestations yourself. Health hazards associated with the misapplication of traditional and nontraditional chemical-based insecticides and pesticides poses too great a risk to you, your family and pets, and your neighbors.
- Do comply with eradication protocol. If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed-bug-eradication protocol set forth by both your owner and their designated pest-management company.

TAA Official Statewide Form 19-JJ, Revised October 2019
Copyright 2019, Texas Apartment Association, Inc.

INSURANCE ADDENDUM

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____ 930 _____ in the
Tzadik Lone Oak Apartments DBA Lone Oak Apartments
_____ Apartments in _____ Weatherford _____,
Texas OR
the house, duplex, etc. located at (street address) _____
_____ in _____, Texas.
The terms of this addendum will control if the term of the Lease and this addendum conflict.

2. **Required Insurance Policy.** In accordance with the Lease, you understand and agree that this addendum requires Resident, at Resident's sole expense, to buy and maintain a liability insurance policy during the entire Lease term and any renewal periods that provides limits of liability to third parties in amount not less than $ ____100000.00____ per occurrence. The liability insurance policy Resident buys and maintains must cover the actions or inactions of Resident and your occupants and guests, and be issued or underwritten by a carrier of your choice licensed to do business in Texas. The required insurance policy must identify the Owner identified in the Lease (or another entity designated by Owner) as an "Interested Party" or "Party of Interest" that will be notified by the insurer of any cancellation, non-renewal, or material change in your coverage no later than 30 days after such action. You must provide us written proof of compliance with the Lease and this addendum on or prior to the Lease commencement date; and if you do not you will not be granted possession of the Premises. You must also provide us written proof of compliance within 7 days of our written request at any other time we request it.

3. **Acknowledgement.** You acknowledge that Owner does not acquire or maintain insurance for Resident's benefit or which is designed to insure you for personal injury, loss or damage to your personal property or belongings, or your own liability for injury, loss or damage that you (or your occupants or guests) may cause others. Any insurance policy that insures you for personal injury, loss or damage to your personal property or belongings, or provide you coverage for your own liability for injury, loss or damage that you (or your occupants or guests) may cause others must be bought and maintained solely by you. We do not and are not able to provide you with information on insurance coverage, rates, or terms and conditions. You should instead seek such information from a licensed insurance company, licensed insurance agent, other licensed insurance professional, or the Texas Department of Insurance. The Texas Department of Insurance website at www.tdi.texas.gov may contain useful consumer information regarding renter's insurance. You further acknowledge that we have made no referrals, guarantees, representations or promises whatsoever concerning any insurance or services provided by any insurance company. At all times you have been and remain free to contract for the required insurance with the insurance carrier of your choosing.

4. **Default.** You understand and agree that your failure to comply with either the requirements specified in the Lease, this addendum, or both is a material breach by you of the Lease and a default of the Lease for which Owner may sue you for eviction. If you fail to buy and maintain insurance as required by the Lease and this addendum, we may, in our sole discretion, agree to refrain from filing an eviction against you for your default for not having the appropriate insurance in place upon payment by you to Owner of $ _____50.00_____ (which you agree is not a liquidated damages amount and which sum shall only apply to each month (or part thereof) you remain in breach of this insurance addendum). Owner will agree to forego commencement of an eviction based upon non-compliance with this addendum for a one-month period, during which you shall come into compliance with this addendum. Our choice to accept money from you to forego pursuit of an eviction for one month does not require us to accept money from you or forego pursuit of our remedies under this paragraph for any subsequent months. The foregoing payments are due on the 1st day of the month following the calendar month (or part thereof) during which you do not have the required insurance, with no grace period. PAYMENT OF SAID AMOUNT DOES NOT RELIEVE YOU OF YOUR OBLIGATION TO BUY AND MAINTAIN INSURANCE AS SUMMARIZED IN PARAGRAPH 2 OF THIS ADDENDUM, DOES NOT CURE THE MATERIAL BREACH AND DEFAULT DESCRIBED IN THIS PARAGRAPH, IN WHOLE OR IN PART, AND DOES NOT RELIEVE YOU OF ANY OBLIGATION TO COMPENSATE US OR ANY OTHER PARTY INJURED OR DAMAGED BY THE ACTIONS OR INACTIONS OF RESIDENT OR YOUR OCCUPANTS OR GUESTS. You further understand that we will not buy an insurance policy for you or for your benefit, and that nothing in this Lease shall be considered an agreement by Owner to furnish you with any insurance coverage.

**NOTICE TO RESIDENT:** YOU SHOULD BE AWARE THAT THE REQUIRED INSURANCE POLICY UNDER THIS ADDENDUM DOES NOT PROTECT YOU AGAINST LOSS OR DAMAGE TO YOUR PERSONAL PROPERTY OR BELONGINGS.  YOU ARE STRONGLY ENCOURAGED TO BUY INSURANCE THAT COVERS YOU AND YOUR PROPERTY.

I have read, understand and agree to comply with the preceding provisions: [All Residents must sign this addendum]


_____          _____
Signature of All Residents                                      Signature of Owner or Owner's Representative

_____

_____

_____

_____

**Texas Apartment Association**

**TEXAS APARTMENT ASSOCIATION**

**M E M B E R**

# Inventory and Condition Form

Resident's Name: __Yvonne Reed__ ___ Personal#:(___)___ Work#:(___)___
Resident's Name: _____ Personal#:(___)___ Work#:(___)___
Resident's Name: _____ Personal#:(___)___ Work#:(___)___
Resident's Name: _____ Personal#:(___)___ Work#:(___)___
Resident's Name: _____ Personal#:(___)___ Work#:(___)___
Resident's Name: _____ Personal#:(___)___ Work#:(___)___

Apartment Community Name: __Tzadik Lone Oak Apartments DBA Lone Oak Apartments__
or Street Address (if house, duplex, etc.): _____ Apt.# __930__

*Within 48 hours after move-in, you must note on this form all defects, damage, or safety or pest-related concerns and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition. Please mark through items listed below or put "none" if the items don't exist. This form protects both you (the resident) and us (the owner). We'll use it in determining what should and should not be considered your responsibility upon move-out. You are entitled to a copy of this form after it is filled out and signed by you and us.*

☐ **Move-In or** ☐ **Move-Out Condition** *(Check one)*

**Living Room**
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____
Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Closets, rods, shelves _____
Closet lights, fixtures _____
Lamps, bulbs _____
Water stains or mold on walls, ceilings or baseboards _____
Other _____

**Kitchen**
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____
Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Cabinets, drawers, handles _____
Countertops _____
Stove/oven, trays, pans, shelves _____
Vent hood _____
Refrigerator, trays, shelves _____
Refrigerator light, crisper _____
Dishwasher, dispensers, racks _____
Sink/disposal _____
Microwave _____
Plumbing leaks, water stains or mold on walls, ceilings or baseboards _____
Other _____

**General Items**
Thermostat _____
Cable TV or master antenna _____
A/C filter _____
Washer/dryer _____
Garage door _____
Ceiling fans _____
Exterior doors, screens/screen doors, doorbell _____
Fireplace _____
Other _____

**Dining Room**
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____
Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Closets, rods, shelves _____
Closet lights, fixtures _____
Water stains or mold on walls, ceilings or baseboards _____
Other _____

**Halls**
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____
Doors, stops, locks _____
Closets, rods, shelves _____
Closet lights, fixtures _____
Water stains or mold on walls, ceilings or baseboards _____
Other _____

**Exterior (if applicable)**
Patio/yard _____
Fences/gates _____
Faucets _____
Balconies _____
Other _____

**Bedroom** *(describe which one)*:
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____
Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Closets, rods, shelves _____
Closet lights, fixtures _____
Water stains or mold on walls, ceilings or baseboards _____
Other _____

© TEXAS APARTMENT ASSOCIATION, INC., 2021

CONTINUED ON BACK SIDE

**Bedroom** (describe which one): _____

Walls _____

_____

Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____

Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Closets, rods, shelves _____
Closet lights, fixtures _____
Water stains or mold on walls, ceilings or baseboards _____

_____

Other _____

**Bath** (describe which one): _____
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Exhaust fan/heater _____
Floor/carpet _____

Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Sink, faucet, handles, stopper _____
Countertops _____
Mirror _____
Cabinets, drawers, handles _____
Toilet, paper holder _____
Bathtub, enclosure, stopper _____
Shower, doors, rods _____
Tile _____
Plumbing leaks, water stains or mold on walls, ceilings or baseboards

Other _____

**Half Bath**
Walls _____

_____

Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Exhaust fan/heater _____
Floor/carpet _____

Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Sink, faucet, handles, stopper _____
Countertops _____
Mirror _____
Cabinets, drawers, handles _____
Toilet, paper holder _____
Tile _____
Plumbing leaks, water stains or mold on walls, ceilings or baseboards

Other _____

**Bedroom** (describe which one): _____

Walls _____

_____

Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Floor/carpet _____

Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Closets, rods, shelves _____
Closet lights, fixtures _____
Water stains or mold on walls, ceilings or baseboards _____

_____

Other _____

**Bath** (describe which one): _____
Walls _____
Wallpaper _____
Plugs, switches, A/C vents _____
Woodwork/baseboards _____
Ceiling _____
Light fixtures, bulbs _____
Exhaust fan/heater _____
Floor/carpet _____

Doors, stops, locks _____
Windows, latches, screens _____
Window coverings _____
Sink, faucet, handles, stopper _____
Countertops _____
Mirror _____
Cabinets, drawers, handles _____
Toilet, paper holder _____
Bathtub, enclosure, stopper _____
Shower, doors, rods _____
Tile _____
Plumbing leaks, water stains or mold on walls, ceilings or baseboards

Other _____

**Safety or Pest-Related Items** (Put "none" if item does not exist)
Door knob locks _____
Keyed deadbolt locks _____
Keyless deadbolts _____
Keyless bolting devices _____
Sliding door latches _____
Sliding door security bars _____
Sliding door pin locks _____
Doorviewers _____
Window latches _____
Porch and patio lights _____ . _____
Smoke alarms (push button to test) _____
Other detectors _____
Alarm system _____
Fire extinguishers (look at charge level—BUT DON'T TEST!) _____
Garage door opener _____
Gate access card(s) _____
Other _____

Pest-related concerns _____

_____

**Date of Move-In:** _____

**or Date of Move-Out:** _____

**Acknowledgment.** You agree you will complete and submit this form in accordance with this Lease and our Community Policies. You acknowledge you will inspect and test all the safety-related items (if in the dwelling), as well as smoke alarms and any other detector(s), and confirm that they are working, except as noted on your completed Inventory and Condition Form. All items will be assumed to be in good condition unless otherwise noted. You acknowledge you will receive written operating instructions on the alarm system and gate access entry systems (if there are any). You acknowledge that you will inspect the dwelling and confirm no signs of bed bugs or other pests are present, or that you will report any bed bug or pest issues through a work order or other repair request.

*In signing below, you acknowledge receipt of this form and accept the responsibility for completing it as part of the Lease Contract. You agree that, either after completion or 48 hours after move-in without returning this form (whichever comes first), it accurately reflects the condition of the premises for purposes of determining any refund due to you when you move out.*

**Resident or Resident's Agent:** _____   **Date of Signing:** _____

**Owner or Owner's Representative:** _____   **Date of Signing:** _____

---

**FOR OFFICE USE ONLY.**
Date completed form was received: _____   Received by: _____

TAA Official Statewide Form 21-H, Revised June, 2021
Copyright 2021, Texas Apartment Association, Inc.



![TAA logo] TEXAS APARTMENT ASSOCIATION

# Animal Addendum

> *Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for an animal, you'll be liable if it causes damage or disturbs other residents.*

**1. Dwelling Unit.**
Unit # **930**, at **1829 Lone Oak Rd APT 930**
*(street address)* in **Weatherford**
*(city)*, Texas **76086** *(zip code)*.

**2. Lease.**
Owner's name: **Tzadik Lone Oak Apartments DBA Lone Oak Apartments**

Residents *(list all residents)*: **Yvonne Reed**

**3. Conditional Authorization for Animal.** You may keep the animal or animals described below in the dwelling until the Lease expires. We may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you, your animal, your guest, or any occupant violates any of the rules in this addendum.

**4. Animal Deposit.** You must pay a one-time animal deposit of $_____ when you sign this addendum. This deposit is in addition to your total security deposit under the Lease, which is a general security deposit for all purposes. Refund of the total security deposit is subject to the terms and conditions in the Lease, and this animal-deposit portion of the total security deposit is not separately refundable even if the animal is removed.

**5. Assistance or Service Animals.** When allowed by applicable laws, we may require written verification of or make other inquiries regarding the disability-related need for an assistance or service animal for a person with a disability. We will not charge an animal deposit, additional rent, or other fee for any authorized assistance or service animal. Except as provided by applicable law, all other provisions of this addendum apply to assistance or service animals.

**6. Search and Rescue Dogs.** We may ask the handler of a search and rescue dog for proof he or she is a person with a certification issued by a nationally recognized search and rescue agency before we authorize a search and rescue dog. If we authorize a search and rescue dog, we will not charge an animal deposit, additional rent or other fee for any such dog. Except as provided by applicable law, all other provisions of this addendum apply to search and rescue dogs.

**7. Additional Monthly Rent.** Your monthly base rent (as stated in the Lease) will be increased by $ **30.00**.

**8. Additional Fee.** You must also pay a one-time nonrefundable fee of $ **300.00** to keep the animal in the dwelling unit. The fee is due when you sign this addendum.

**9. Liability Not Limited.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damage, cleaning, deodorization, defleaing, replacements, or personal injuries.

**10. Description of Animal.** You may keep only the animal or animals described below. You may not substitute any other animal. Neither you nor your guests or occupants may bring any other animal—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or apartment community.
Animal's name: **no pets**
Type: _____
Breed: _____
Color: _____
Weight: _____
Age: _____
City of license: _____

License #: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____
Age: _____
City of license: _____
License #: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____
Age: _____
City of license: _____
License #: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

**11. Special Provisions.** The following special provisions control over any conflicting provisions of this addendum: **All pets must be leashed while outside except in the dog park while being supervised. All pet waste must be picked up immediately and disposed of properly. Resident will pay $60 for a DNA swab kit per dog. If a positive DNA test result is received the resident will be charged a $200 fine.**

**12. Emergency.** In an emergency involving an accident or injury to your animal, we have the right—but not the duty—to take the animal to the following veterinarian for treatment, at your expense.
Doctor: _____
Address: _____
City/State/Zip: _____
Phone: (_____) _____

**13. Animal Rules.** You are responsible for the animal's actions at all times. You agree to follow these rules:

**13.1 Shots and Licenses.** The animal at all times must have current rabies shots and licenses required by law. You must show us evidence of the shots and licenses if we ask.

**13.2 Disturbances.** The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

**13.3 Housebreaking, Cages, Offspring.** Dogs, cats, assistance or service animals, and search and rescue dogs must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

**13.4 Indoor Waste Areas.** Inside, the animal may urinate or defecate only in these designated areas: _____

**13.5 Outdoor Waste Areas.** Outside, the animal may urinate or defecate only in these designated areas: _____

**13.6 Tethering.** Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

©2022 TEXAS APARTMENT ASSOCIATION, INC.

CONTINUED ON BACK

**13.7 Off-Limit Areas.** You must not let an animal—other than an assistance or service animal—into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units besides your own, except that search and rescue dogs shall be allowed to use areas of the property accessible to the general public, such as the leasing office. Certain service animals in training shall also be allowed to use those areas when accompanied by an approved trainer.

**13.8 Food & Water.** Your animal must be fed and given water inside the dwelling unit. You may not leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

**13.9 Leash.** You must keep the animal on a leash and under your supervision when outside the dwelling or in any private fenced area. We or our representative may pick up unleashed animals, report them to the proper authorities, or do both. We'll charge you a reasonable fee for picking up and keeping unleashed animals.

**13.10 Animal Waste.** Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate anywhere on our property and you must take the animal off our property for that purpose. If we allow animal defecation inside the unit, you must ensure that it's done in a litter box with a kitty-litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you must immediately remove the waste and repair any damage. In addition to the terms of this addendum, you must comply with all local ordinances regarding animal defecation.

**14. Additional Rules.** We may make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**15. Violation of Rules.** If you, your guest, or any occupant violates any rule or provision of this addendum (in our judgment) and we give you written notice of the violation, you must remove the animal immediately and permanently from the premises. We also have all other rights and remedies set forth in the Lease, including eviction and recovering damages and attorney's fees from you.

**16. Complaints About Animal.** If we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents, we will give you written notice and you must immediately and permanently remove the animal from the premises.

**17. Our Removal of an Animal.** In some circumstances, we may enter the dwelling unit and remove the animal within one day after leaving a written notice in a conspicuous place.

**17.1 Causes for Removal.** We can remove an animal under this paragraph if, in our sole judgment, you have:
(A) abandoned the animal;
(B) left the animal in the dwelling unit for an extended period of time without food or water;
(C) failed to care for a sick animal;
(D) violated our animal rules; OR
(E) let the animal defecate or urinate where it's not allowed.

**17.2 Removal Process.** To remove an animal, we must follow the procedures in the Lease, and we may turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within five days after we remove it, it will be considered abandoned.

**18. Liability for Damage, Injuries, Cleaning.** Except for reasonable wear and tear resulting from an assistance or service animal, you and all co-residents are jointly and severally liable for the entire amount of any damage the animal causes, including cleaning, defleaing, or deodorizing. This provision applies to all parts of the dwelling unit including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, and appliances, as well as landscaping and other outside improvements. If an item cannot be satisfactorily cleaned or repaired, you must pay for us to replace it. Payment for damage, repairs, cleaning, replacements, and the like are due immediately upon demand. As the owner, you're strictly liable for the entire amount of any injury that your animal causes to another person or to anyone's property. You indemnify us for all costs of litigation and attorney's fees resulting from any such injury or damage.

**19. Move-Out.** Except for reasonable wear and tear resulting from an assistance or service animal, when you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**20. Multiple Residents.** Each resident who signed the Lease must also sign this addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this addendum, even if the resident does not own the animal.

**21. Dog Park.** We may provide an area to be used as a dog park. While using the park, you will be required to supervise your dog, but may remove the leash. Leashes must be used while traveling to and from the park. The park is not supervised or monitored in any way, and you use the park at your own risk. We are not liable for any injury, damage or loss which is caused as a result of any problem, defect or malfunction of the park. We are also not liable for injury, damage or loss to any person, animal or property caused by any other person or animal, including, but not limited to, dog bite, trespass, assault or any other crime. Furthermore, we are not liable for any disruption in the park's operation or performance. You hereby release us and our agents, contractors, employees and representatives from any liability connected with the park. You agree to be responsible for any property damage caused by you, your guests or other occupants to the park. You understand that participating in any activity at the park carries a risk of injury, and you are willing to assume this risk. We make no representations or warranties of any kind regarding the park.

**22. General.** You acknowledge that no other oral or written agreement exists regarding animals. Except for any special provisions noted in paragraph 11 above, our representative has no authority to modify this addendum or the animal rules except in writing as described under paragraph 14. This Animal Addendum and the animal rules are considered part of the Lease described above.

**23. Animal Restrictions.** No animal will be allowed that poses a threat to any other person. You represent that your animal(s) does not pose a danger or threat of any kind to any person or property; has not displayed vicious, aggressive or dangerous behavior; and has never before injured you or any other person or animal or caused any damage to your property or another person's property. You affirmatively represent and warrant that you have never had a claim or lawsuit filed against you or anyone else for an injury or damage caused by or related to the animal. You understand and agree that the approval of the animal to live in your apartment is expressly conditioned upon all of the forgoing being true and if you have made any misrepresentation it is a violation of the Lease.

**You are legally bound by this document. Please read it carefully.**

*You are entitled to receive a copy of this Addendum after it is fully signed. Keep it in a safe place.*

**Resident or Residents** *(all sign below)*

_____
(Name of Resident)                                    Date signed

_____
(Name of Resident)                                    Date signed

_____
(Name of Resident)                                    Date signed

_____
(Name of Resident)                                    Date signed

_____
(Name of Resident)                                    Date signed

_____
(Name of Resident)                                    Date signed

**Owner or Owner's Representative** *(sign below)*

_____
                                                      Date signed

## WATER AND WASTEWATER SUBMETERING ADDENDUM

**1. Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____930_____ in the __Tzadik Lone Oak Apartments DBA Lone Oak Apartments_____ Apartments in _____Weatherford_____, **Texas OR** the house, duplex. etc. located at *(street address)* _____ in _____, Texas.

**2. PUC.** Water conservation by submeter billing is encouraged by the Public Utility Commission of Texas (PUC). Submeter billing is regulated by PUC rules, and a copy of the rules is attached to this addendum. This addendum complies with those rules.

**3. Mutual Conservation Efforts.** We agree to use our best efforts to repair any water leaks inside or outside your apartment no later than 7 days after we learn about them. You agree to use your best efforts to follow the water-conservation suggestions listed in the checklist below.

**4. Submeter Billing Procedures.** Your monthly rent under the TAA Lease does *not* include a charge for water and wastewater. Instead, you will receive a separate monthly bill from us for submetered water and wastewater use, as follows:

(A) Your monthly water and wastewater bill will conform to all applicable rules of the PUC (see attached).

(B) As permitted by state law, a service fee of _____9_____% (not to exceed 9%) will be added to your monthly water-service charges.

(C) No other administrative or other fees will be added to your bill unless expressly allowed by law or PUC rules. No other amounts will be included in the bill except your unpaid balances and any late fees (if incurred by you). If we fail to pay our mastermeter bill to the utility company on time and incur penalties or interest, no portion of these amounts will be included in your bill.

(D) We will calculate your submetered share of the mastermetered water bill according to PUC rules, Section 24.281.

(E) We will bill you monthly for your submetered water consumption from approximately the ____1____ day of the month to the ____30____ day of the month, the latter being our scheduled submeter-reading date. Your bill will be calculated in accordance with PUC rules and this Addendum and will be prorated for the first and last months you live in the unit.

(F) PUC rules require us to publish figures from the previous calendar year if that information is available. The average monthly bill for all dwelling units in the apartment community last year was $ _____ per unit, varying from $ _____ for the lowest month's bill to $ _____ for the highest month's bill for any unit. This information may or may not be relevant since the past amounts may not reflect future changes in utility-company water rates, weather variations, future total water consumption, changes in water-consumption habits of residents, and other unpredictable factors.

(G) During regular weekday office hours, you may examine: (1) our water and wastewater bills from the utility company; (2) our calculation of your monthly submeter bill; and (3) any other information available to you under PUC rules. Please give us reasonable advance notice to gather the data. Any disputes relating to the computation of your bill will be between you and us.

**5. Your Payment-Due Date.** Payment of your submeter water and wastewater bill is due 16 days after the date it is postmarked or hand delivered to your apartment. You agree to mail or deliver payment to the place indicated on your bill so that payment is received no later than the due date. You will pay a late charge of 5% of your water and wastewater bill if we do not receive your payment on time.

### A Checklist of Water-Conservation Ideas for Your Dwelling

#### In the bathroom . . .

- Never put cleansing tissues, dental floss, cigarette butts, or other trash in the toilet.
- When brushing your teeth, turn off the water until you need to rinse your mouth.
- When shaving, fill the sink with hot water instead of letting the faucet run.
- Take a shower instead of filling the tub and taking a bath.
- Take a shorter shower. Showers may use up to half of your interior water consumption.
- If you take a tub bath, reduce the water level by one or two inches.
- Shampoo your hair in the shower.
- Test toilets for leaks. Add a few drops of food coloring to the tank, but do not flush. Watch to see if the coloring appears in the bowl within a few minutes. If it does, the fixture needs adjustment or repair. A slow drip can waste as much as 170 gallons a day or 5,000 gallons per month. Report all leaks to management.
- Don't leave water running while cleaning bathroom fixtures.

#### In the kitchen . . .

- Run your dishwasher only when you have a full load.
- If you wash dishes by hand, don't leave the water running for washing or rinsing. Fill the sink instead.
- Use your sink disposal sparingly, and never for just a few scraps.
- Keep a container of drinking water in the refrigerator.
- When cleaning vegetables, use a pan of cold water rather than letting the faucet run.
- For cooking most food, use only a little water and place a lid on the pot.
- Report all leaks to management.

#### When doing the laundry . . .

- Wash only full loads of laundry or else adjust the water level to match the size of the load (if you have this option).
- Use cold water as often as possible to save energy and to conserve the hot water for uses that cold water cannot serve.

*Attached: PUC Rules for Submetered Water or Wastewater Service*
Also note that the service fee referenced in item 4(B) does not apply to properties receiving Low-Income Housing Tax Credits or to properties receiving tenant-based vouchers.

_____     _____
Resident or Residents [All residents must sign here]     Owner or Owner's Representative [sign here]

_____

_____

_____

_____

**Texas Apartment Association**

**Water allocation and submetering is regulated by the Texas Public Utility Commission (PUC). In accordance with PUC rules, a copy of the applicable rules is provided to you below:**

SUBCHAPTER I: WATER UTILITY SUBMETERING AND ALLOCATION

§ 24.275. General Rules and Definitions

(a) Purpose and scope. The provisions of this subchapter are intended to establish a comprehensive regulatory system to assure that the practices involving submetered and allocated billing of dwelling units and multiple use facilities for water and sewer utility service are just and reasonable and include appropriate safeguards for tenants.

(b) Application. The provisions of this subchapter apply to apartment houses, condominiums, multiple use facilities, and manufactured home rental communities billing for water and wastewater utility service on a submetered or allocated basis. The provisions of this subchapter do not limit the authority of an owner, operator, or manager of an apartment house, manufactured home rental community, or multiple use facility to charge, bill for, or collect rent, an assessment, an administrative fee, a fee relating to upkeep or management of chilled water, boiler, heating, ventilation, air conditioning, or other building system, or any other amount that is unrelated to water and sewer utility service costs.

(c) Definitions. The following words and terms, when used in this subchapter, have the defined meanings, unless the context clearly indicates otherwise.

(1) Allocated utility service--Water or wastewater utility service that is master metered to an owner by a retail public utility and allocated to tenants by the owner.

(2) Apartment house--A building or buildings containing five or more dwelling units that are occupied primarily for nontransient use, including a residential condominium whether rented or owner occupied, and if a dwelling unit is rented, having rent paid at intervals of one month or more.

(3) Condominium manager--A condominium unit owners' association organized under Texas Property Code §82.101, or an incorporated or unincorporated entity comprising the council of owners under Chapter 81, Property Code. Condominium Manager and Manager of a Condominium have the same meaning.

(4) Customer service charge--A customer service charge is a rate that is not dependent on the amount of water used through the master meter.

(5) Dwelling unit--One or more rooms in an apartment house or condominium, suitable for occupancy as a residence, and containing kitchen and bathroom facilities; a unit in a multiple use facility; or a manufactured home in a manufactured home rental community.

(6) Dwelling unit base charge--A flat rate or fee charged by a retail public utility for each dwelling unit recorded by the retail public utility.

(7) Manufactured home rental community--A property on which spaces are rented for the occupancy of manufactured homes for nontransient residential use and for which rental is paid at intervals of one month or longer.

(8) Master meter--A meter used to measure, for billing purposes, all water usage of an apartment house, condominium, multiple use facility, or manufactured home rental community, including common areas, common facilities, and dwelling units.

(9) Multiple use facility--A commercial or industrial park, office complex, or marina with five or more units that are occupied primarily for nontransient use and are rented at intervals of one month or longer.

(10) Occupant--A tenant or other person authorized under a written agreement to occupy a dwelling.

(11) Overcharge--The amount, if any, a tenant is charged for submetered or nonsubmetered master metered utility service to the tenant's dwelling unit after a violation occurred relating to the assessment of a portion of utility costs in excess of the amount the tenant would have been charged under this subchapter. Overcharge and Overbilling have the same meaning.

(12) Owner--The legal titleholder of an apartment house, a manufactured home rental community, or a multiple use facility; and any individual, firm, or corporation expressly identified in the lease agreement as the landlord of tenants in the apartment house, manufactured home rental community, or multiple use facility. The term does not include the manager of an apartment home unless the manager is expressly identified as the landlord in the lease agreement.

(13) Point-of-use submeter--A device located in a plumbing system to measure the amount of water used at a specific point of use, fixture, or appliance, including a sink, toilet, bathtub, or clothes washer.

(14) Submetered utility service--Water utility service that is master metered for the owner by the retail public utility and individually metered by the owner at each dwelling unit; wastewater utility service based on

submetered water utility service; water utility service measured by point-of-use submeters when all of the water used in a dwelling unit is measured and totaled; or wastewater utility service based on total water use as measured by point-of-use submeters.

(15) Tenant--A person who owns or is entitled to occupy a dwelling unit or multiple use facility unit to the exclusion of others and, if rent is paid, who is obligated to pay for the occupancy under a written or oral rental agreement.

(16) Undercharge--The amount, if any, a tenant is charged for submetered or nonsubmetered master metered utility service to the tenant's dwelling unit less than the amount the tenant would have been charged under this subchapter. Undercharge and Underbilling have the same meaning.

(17) Utility costs--Any amount charged to the owner by a retail public utility for water or wastewater service. Utility Costs and Utility Service Costs have the same meaning.

(18) Utility service--For purposes of this subchapter, utility service includes only drinking water and wastewater.

§ 24.277. Owner Registration and Records

(a) Registration. An owner who intends to bill tenants for submetered or allocated utility service or who changes the method used to bill tenants for utility service shall register with the commission in a form prescribed by the commission.

(b) Water quantity measurement. Except as provided by subsections (c) and (d) of this section, a manager of a condominium or the owner of an apartment house, manufactured home rental community, or multiple use facility, on which construction began after January 1, 2003, shall provide for the measurement of the quantity of water, if any, consumed by the occupants of each unit through the installation of:

(1) submeters, owned by the property owner or manager, for each dwelling unit or rental unit; or

(2) individual meters, owned by the retail public utility, for each dwelling unit or rental unit.

(c) Plumbing system requirement. An owner of an apartment house on which construction began after January 1, 2003, and that provides government assisted or subsidized rental housing to low or very low income residents shall install a plumbing system in the apartment house that is compatible with the installation of submeters for the measurement of the quantity of water, if any, consumed by the occupants of each unit.

(d) Installation of individual meters. On the request by the property owner or manager, a retail public utility shall install individual meters owned by the utility in an apartment house, manufactured home rental community, multiple use facility, or condominium on which construction began after January 1, 2003, unless the retail public utility determines that installation of meters is not feasible. If the retail public utility determines that installation of meters is not feasible, the property owner or manager shall install a plumbing system that is compatible with the installation of submeters or individual meters. A retail public utility may charge reasonable costs to install individual meters.

(e) Records. The owner shall make the following records available for inspection by the tenant or the commission or commission staff at the on-site manager's office during normal business hours in accordance with subsection (g) of this section. The owner may require that the request by the tenant be in writing and include:

(1) a current and complete copy of TWC, Chapter 13, Subchapter M;

(2) a current and complete copy of this subchapter;

(3) a current copy of the retail public utility's rate structure applicable to the owner's bill;

(4) information or tips on how tenants can reduce water usage;

(5) the bills from the retail public utility to the owner;

(6) for allocated billing:

(A) the formula, occupancy factors, if any, and percentages used to calculate tenant bills;

(B) the total number of occupants or equivalent occupants if an equivalency factor is used under §24.281(e)(2) of this title (relating to Charges and Calculations); and

(C) the square footage of the tenant's dwelling unit or rental space and the total square footage of the apartment house, manufactured home rental community, or multiple use facility used for billing if dwelling unit size or rental space is used;

(7) for submetered billing:

(A) the calculation of the average cost per gallon, liter, or cubic foot;

(B) if the unit of measure of the submeters or point-of-use submeters differs from the unit of measure of the master meter, a chart for converting the tenant's submeter measurement to that used by the retail public utility;

(C) all submeter readings; and

(D) all submeter test results;

(8) the total amount billed to all tenants each month;

(9) total revenues collected from the tenants each month to pay for water and wastewater service; and

(10) any other information necessary for a tenant to calculate and verify a water and wastewater bill.

(f) Records retention. Each of the records required under subsection (e) of this section shall be maintained for the current year and the previous calendar year, except that all submeter test results shall be maintained until the submeter is permanently removed from service.

(g) Availability of records.

(1) If the records required under subsection (e) of this section are maintained at the on-site manager's office, the owner shall make the records available for inspection at the on-site manager's office within three days after receiving a written request.

(2) If the records required under subsection (e) of this section are not routinely maintained at the on-site manager's office, the owner shall provide copies of the records to the on-site manager within 15 days of receiving a written request from a tenant or the commission or commission staff.

(3) If there is no on-site manager, the owner shall make copies of the records available at the tenant's dwelling unit at a time agreed upon by the tenant within 30 days of the owner receiving a written request from the tenant.

(4) Copies of the records may be provided by mail if postmarked by midnight of the last day specified in paragraph (1), (2), or (3) of this subsection.

## § 24.279. Rental Agreement

(a) Rental agreement content. The rental agreement between the owner and tenant shall clearly state in writing:

(1) the tenant will be billed by the owner for submetered or allocated utility services, whichever is applicable;

(2) which utility services will be included in the bill issued by the owner;

(3) any disputes relating to the computation of the tenant's bill or the accuracy of any submetering device will be between the tenant and the owner;

(4) the average monthly bill for all dwelling units in the previous calendar year and the highest and lowest month's bills for that period;

(5) if not submetered, a clear description of the formula used to allocate utility services;

(6) information regarding billing such as meter reading dates, billing dates, and due dates;

(7) the period of time by which owner will repair leaks in the tenant's unit and in common areas, if common areas are not submetered;

(8) the tenant has the right to receive information from the owner to verify the utility bill; and

(9) for manufactured home rental communities and apartment houses, the service charge percentage permitted under §24.281(d)(3) of this title (relating to Charges and Calculations) that will be billed to tenants.

(b) Requirement to provide rules. At the time a rental agreement is discussed, the owner shall provide a copy of this subchapter or a copy of the rules to the tenant to inform the tenant of his rights and the owner's responsibilities under this subchapter.

(c) Tenant agreement to billing method changes. An owner shall not change the method by which a tenant is billed unless the tenant has agreed to the change by signing a lease or other written agreement. The owner shall provide notice of the proposed change at least 35 days prior to implementing the new method.

(d) Change from submetered to allocated billing. An owner shall not change from submetered billing to allocated billing, except after receiving written approval from the commission after a demonstration of good cause and if the rental agreement requirements under subsections (a), (b), and (c) of this section have been met. Good cause may include:

(1) equipment failures; or

(2) meter reading or billing problems that could not feasibly be corrected.

(e) Waiver of tenant rights prohibited. A rental agreement provision that purports to waive a tenant's rights or an owner's responsibilities under this subchapter is void.

## § 24.281. Charges and Calculations

(a) Prohibited charges. Charges billed to tenants for submetered or allocated utility service may only include bills for water or wastewater from the retail public utility and must not include any fees billed to the owner by the retail public utility for any deposit, disconnect, reconnect, late payment, or other similar fees.

(b) Dwelling unit base charge. If the retail public utility's rate structure includes a dwelling unit base charge, the owner shall bill each dwelling unit for the base charge applicable to that unit. The owner may not bill tenants for any dwelling unit base charges applicable to unoccupied dwelling units.

(c) Customer service charge. If the retail public utility's rate structure includes a customer service charge, the owner shall bill each dwelling unit the amount of the customer service charge divided by the total number of dwelling units, including vacant units, that can receive service through the master meter serving the tenants.

(d) Calculations for submetered utility service. The tenant's submetered charges must include the dwelling unit base charge and customer service charge, if applicable, and the gallonage charge and must be calculated each month as follows:

(1) water utility service: the retail public utility's total monthly charges for water service (less dwelling unit base charges or customer service charges, if applicable), divided by the total monthly water consumption measured by the retail public utility to obtain an average water cost per gallon, liter, or cubic foot, multiplied by the tenant's monthly consumption or the volumetric rate charged by the retail public utility to the owner multiplied by the tenant's monthly water consumption;

(2) wastewater utility service: the retail public utility's total monthly charges for wastewater service (less dwelling unit base charges or customer service charges, if applicable), divided by the total monthly water consumption measured by the retail public utility, multiplied by the tenant's monthly consumption or the volumetric wastewater rate charged by the retail public utility to the owner multiplied by the tenant's monthly water consumption;

(3) service charge for manufactured home rental community or the owner or manager of apartment house: a manufactured home rental community or apartment house may charge a service charge in an amount not to exceed 9% of the tenant's charge for submetered water and wastewater service, except when:

(A) the resident resides in a unit of an apartment house that has received an allocation of low income housing tax credits under Texas Government Code, Chapter 2306, Subchapter DD; or

(B) the apartment resident receives tenant-based voucher assistance under United States Housing Act of 1937 Section 8, (42 United States Code, §1437f); and

(4) final bill on move-out for submetered service: if a tenant moves out during a billing period, the owner may calculate a final bill for the tenant before the owner receives the bill for that period from the retail public utility. If the owner is billing using the average water or wastewater cost per gallon, liter, or cubic foot as described in paragraph (1) of this subsection, the owner may calculate the tenant's bill by calculating the tenant's average volumetric rate for the last three months and multiplying that average volumetric rate by the tenant's consumption for the billing period.

(e) Calculations for allocated utility service.

(1) Before an owner may allocate the retail public utility's master meter bill for water and sewer service to the tenants, the owner shall first deduct:

(A) dwelling unit base charges or customer service charge, if applicable; and

(B) common area usage such as installed landscape irrigation systems, pools, and laundry rooms, if any, as follows:

(i) if all common areas are separately metered or submetered, deduct the actual common area usage;

(ii) if common areas that are served through the master meter that provides water to the dwelling units are not separately metered or submetered and there is an installed landscape irrigation system, deduct at least 25% of the retail public utility's master meter bill;

(iii) if all water used for an installed landscape irrigation system is metered or submetered and there are other common areas such as pools or laundry rooms that are not metered or submetered, deduct at least 5% of the retail public utility's master meter bill; or

(iv) if common areas that are served through the master meter that provides water to the dwelling units are not separately metered or

submetered and there is no installed landscape irrigation system, deduct at least 5% of the retail public utility's master meter bill.

(2) To calculate a tenant's bill:

(A) for an apartment house, the owner shall multiply the amount established in paragraph (1) of this subsection by:

(i) the number of occupants in the tenant's dwelling unit divided by the total number of occupants in all dwelling units at the beginning of the month for which bills are being rendered; or

(ii) the number of occupants in the tenant's dwelling unit using a ratio occupancy formula divided by the total number of occupants in all dwelling units at the beginning of the retail public utility's billing period using the same ratio occupancy formula to determine the total. The ratio occupancy formula will reflect what the owner believes more accurately represents the water use in units that are occupied by multiple tenants. The ratio occupancy formula that is used must assign a fractional portion per tenant of no less than that on the following scale:

(I) dwelling unit with one occupant = 1;

(II) dwelling unit with two occupants = 1.6;

(III) dwelling unit with three occupants = 2.2; or

(IV) dwelling unit with more than three occupants = 2.2 + 0.4 per each additional occupant over three; or

(iii) the average number of occupants per bedroom, which shall be determined by the following occupancy formula. The formula must calculate the average number of occupants in all dwelling units based on the number of bedrooms in the dwelling unit according to the scale below, notwithstanding the actual number of occupants in each of the dwelling unit's bedrooms or all dwelling units:

(I) dwelling unit with an efficiency = 1;

(II) dwelling unit with one bedroom = 1.6;

(III) dwelling unit with two bedrooms = 2.8;

(IV) dwelling unit with three bedrooms = 4 + 1.2 for each additional bedroom; or

(iv) a factor using a combination of square footage and occupancy in which no more than 50% is based on square footage. The square footage portion must be based on the total square footage living area of the dwelling unit as a percentage of the total square footage living area of all dwelling units of the apartment house; or

(v) the individually submetered hot or cold water usage of the tenant's dwelling unit divided by all submetered hot or cold water usage in all dwelling units;

(B) a condominium manager shall multiply the amount established in paragraph (1) of this subsection by any of the factors under subparagraph (A) of this paragraph or may follow the methods outlined in the condominium contract;

(C) for a manufactured home rental community, the owner shall multiply the amount established in paragraph (1) of this subsection by:

(i) any of the factors developed under subparagraph (A) of this paragraph; or

(ii) the area of the individual rental space divided by the total area of all rental spaces; and

(D) for a multiple use facility, the owner shall multiply the amount established in paragraph (1) of this subsection by:

(i) any of the factors developed under subparagraph (A) of this paragraph; or

(ii) the square footage of the rental space divided by the total square footage of all rental spaces.

(3) If a tenant moves in or out during a billing period, the owner may calculate a bill for the tenant. If the tenant moves in during a billing period, the owner shall prorate the bill by calculating a bill as if the tenant were there for the whole month and then charging the tenant for only the number of days the tenant lived in the unit divided by the number of days in the month multiplied by the calculated bill. If a tenant moves out during a billing period before the owner receives the bill for that period from the retail public utility, the owner may calculate a final bill. The owner may calculate the tenant's bill by calculating the tenant's average bill for the last three months and multiplying that average bill by the number of days the tenant was in the unit divided by the number of days in that month.

(f) Conversion to approved allocation method. An owner using an allocation formula other than those approved in subsection (e) of this section shall immediately provide notice as required under §24.279(c) of this title (relating to Rental Agreement) and either:

(1) adopt one of the methods in subsection (e) of this section; or

(2) install submeters and begin billing on a submetered basis; or

(3) discontinue billing for utility services.

§ 24.283. Billing

(a) Monthly billing of total charges. The owner shall bill the tenant each month for the total charges calculated under §24.281 of this title (relating to Charges and Calculations). If it is permitted in the rental agreement, an occupant or occupants who are not residing in the rental unit for a period longer than 30 days may be excluded from the occupancy calculation and from paying a water and sewer bill for that period.

(b) Rendering bill.

(1) Allocated bills shall be rendered as promptly as possible after the owner receives the retail public utility bill.

(2) Submeter bills shall be rendered as promptly as possible after the owner receives the retail public utility bill or according to the time schedule in the rental agreement if the owner is billing using the retail public utility's rate.

(c) Submeter reading schedule. Submeters or point-of-use submeters shall be read within three days of the scheduled reading date of the retail public utility's master meter or according to the schedule in the rental agreement if the owner is billing using the retail public utility's rate.

(d) Billing period.

(1) Allocated bills shall be rendered for the same billing period as that of the retail public utility, generally monthly, unless service is provided for less than that period.

(2) Submeter bills shall be rendered for the same billing period as that of the retail public utility, generally monthly, unless service is provided for less than that period. If the owner uses the retail public utility's actual rate, the billing period may be an alternate billing period specified in the rental agreement.

(e) Multi-item bill. If issued on a multi-item bill, charges for submetered or allocated utility service must be separate and distinct from any other charges on the bill.

(f) Information on bill. The bill must clearly state that the utility service is submetered or allocated, as applicable, and must include all of the following:

(1) total amount due for submetered or allocated water;

(2) total amount due for submetered or allocated wastewater;

(3) total amount due for dwelling unit base charge(s) or customer service charge(s) or both, if applicable;

(4) total amount due for water or wastewater usage, if applicable;

(5) the name of the retail public utility and a statement that the bill is not from the retail public utility;

(6) name and address of the tenant to whom the bill is applicable;

(7) name of the firm rendering the bill and the name or title, address, and telephone number of the firm or person to be contacted in case of a billing dispute; and

(8) name, address, and telephone number of the party to whom payment is to be made.

(g) Information on submetered service. In addition to the information required in subsection (f) of this section, a bill for submetered service must include all of the following:

(1) the total number of gallons, liters, or cubic feet submetered or measured by point-of-use submeters;

(2) the cost per gallon, liter, or cubic foot for each service provided; and

(3) total amount due for a service charge charged by an owner of a manufactured home rental community, if applicable.

(h) Due date. The due date on the bill may not be less than 16 days after it is mailed or hand delivered to the tenant, unless the due date falls on a federal holiday or weekend, in which case the following work day will be the due date. The owner shall record the date the bill is mailed or hand delivered. A payment is delinquent if not received by the due date.

(i) Estimated bill. An estimated bill may be rendered if a master meter, submeter, or point-of-use submeter has been tampered with, cannot be read, or is out of order; and in such case, the bill must be distinctly marked as an estimate and the subsequent bill must reflect an adjustment for actual charges.

(j) Payment by tenant. Unless utility bills are paid to a third-party billing company on behalf of the owner, or unless clearly designated by the tenant, payment must be applied first to rent and then to utilities.

(k) Overbilling and underbilling. If a bill is issued and subsequently found to be in error, the owner shall calculate a billing adjustment. If the tenant is due a refund, an adjustment must be calculated for all of that tenant's bills that

included overcharges. If the overbilling or underbilling affects all tenants, an adjustment must be calculated for all of the tenants' bills. If the tenant was undercharged, and the cause was not due to submeter or point-of-use submeter error, the owner may calculate an adjustment for bills issued in the previous six months. If the total undercharge is $25 or more, the owner shall offer the tenant a deferred payment plan option, for the same length of time as that of the underbilling. Adjustments for usage by a previous tenant may not be back billed to a current tenant.

(l) Disputed bills. In the event of a dispute between a tenant and an owner regarding any bill, the owner shall investigate the matter and report the results of the investigation to the tenant in writing. The investigation and report must be completed within 30 days from the date the tenant gives written notification of the dispute to the owner.

(m) Late fee. A one-time penalty not to exceed 5% may be applied to delinquent accounts. If such a penalty is applied, the bill must indicate the amount due if the late penalty is incurred. No late penalty may be applied unless agreed to by the tenant in a written lease that states the percentage amount of such late penalty.

### § 24.285. Complaint Jurisdiction

(a) Jurisdiction. The commission has exclusive jurisdiction for violations under this subchapter.

(b) Complaints. If an apartment house owner, condominium manager, manufactured home rental community owner, or other multiple use facility owner violates a commission rule regarding utility costs, the person claiming the violation may file a complaint with the commission and may appear remotely for a hearing.

### § 24.287. Submeters or Point-of-Use Submeters and Plumbing Fixtures

(a) Submeters or point-of-use submeters.

(1) Same type submeters or point-of-use submeters required. All submeters or point-of-use submeters throughout a property must use the same unit of measurement, such as gallon, liter, or cubic foot.

(2) Installation by owner. The owner shall be responsible for providing, installing, and maintaining all submeters or point-of-use submeters necessary for the measurement of water to tenants and to common areas, if applicable.

(3) Submeter or point-of-use submeter tests prior to installation. No submeter or point-of-use submeter may be placed in service unless its accuracy has been established. If any submeter or point-of-use submeter is removed from service, it must be properly tested and calibrated before being placed in service again.

(4) Accuracy requirements for submeters and point-of-use submeters. Submeters must be calibrated as close as possible to the condition of zero error and within the accuracy standards established by the American Water Works Association (AWWA) for water meters. Point-of-use submeters must be calibrated as closely as possible to the condition of zero error and within the accuracy standards established by the American Society of Mechanical Engineers (ASME) for point-of-use and branch-water submetering systems.

(5) Location of submeters and point-of-use submeters. Submeters and point-of-use submeters must be installed in accordance with applicable plumbing codes and AWWA standards for water meters or ASME standards for point-of-use submeters, and must be readily accessible to the tenant and to the owner for testing and inspection where such activities will cause minimum interference and inconvenience to the tenant.

(6) Submeter and point-of-use submeter records. The owner shall maintain a record on each submeter or point-of-use submeter which includes:

(A) an identifying number;

(B) the installation date (and removal date, if applicable);

(C) date(s) the submeter or point-of-use submeter was calibrated or tested;

(D) copies of all tests; and

(E) the current location of the submeter or point-of-use submeter.

(7) Submeter or point-of-use submeter test on request of tenant. Upon receiving a written request from the tenant, the owner shall either:

(A) provide evidence, at no charge to the tenant, that the submeter or point-of-use submeter was calibrated or tested within the preceding 24 months and determined to be within the accuracy standards established by the AWWA for water meters or ASME standards for point-of-use submeters; or

(B) have the submeter or point-of-use submeter removed and tested and promptly advise the tenant of the test results.

(8) Billing for submeter or point-of-use submeter test.

(A) The owner may not bill the tenant for testing costs if the submeter fails to meet AWWA accuracy standards for water meters or ASME standards for point-of-use submeters.

(B) The owner may not bill the tenant for testing costs if there is no evidence that the submeter or point-of-use submeter was calibrated or tested within the preceding 24 months.

(C) The owner may bill the tenant for actual testing costs (not to exceed $25) if the submeter meets AWWA accuracy standards or the point-of-use submeter meets ASME accuracy standards and evidence as described in paragraph (7)(A) of this subsection was provided to the tenant.

(9) Bill adjustment due to submeter or point-of-use submeter error. If a submeter does not meet AWWA accuracy standards or a point-of-use submeter does not meet ASME accuracy standards and the tenant was overbilled, an adjusted bill must be rendered in accordance with §24.283(k) of this title (relating to Billing). The owner may not charge the tenant for any underbilling that occurred because the submeter or point-of-use submeter was in error.

(10) Submeter or point-of-use submeter testing facilities and equipment. For submeters, an owner shall comply with the AWWA's meter testing requirements. For point-of-use meters, an owner shall comply with ASME's meter testing requirements.

(b) Plumbing fixtures. After January 1, 2003, before an owner of an apartment house, manufactured home rental community, or multiple use facility or a manager of a condominium may implement a program to bill tenants for submetered or allocated water service, the owner or manager shall adhere to the following standards:

(1) Texas Health and Safety Code, §372.002, for sink or lavatory faucets, faucet aerators, and showerheads;

(2) perform a water leak audit of each dwelling unit or rental unit and each common area and repair any leaks found; and

(3) not later than the first anniversary of the date an owner of an apartment house, manufactured home rental community, or multiple use facility or a manager of a condominium begins to bill for submetered or allocated water service, the owner or manager shall:

(A) remove any toilets that exceed a maximum flow of 3.5 gallons per flush; and

(B) install toilets that meet the standards prescribed by Texas Health and Safety Code, §372.002.

(c) Plumbing fixture not applicable. Subsection (b) of this section does not apply to a manufactured home rental community owner who does not own the manufactured homes located on the property of the manufactured home rental community.

**Mold Information and Prevention Addendum**

TEXAS APARTMENT ASSOCIATION
**M E M B E R**

> *Please note: We want to maintain a high-quality living environment for our residents. To help achieve this goal, it is important that we work together to minimize any mold growth in your dwelling. This addendum contains important information for you, and responsibilities for both you and us.*

**1. Addendum.** This is an addendum to the Lease Contract executed by you, the resident or residents, on the dwelling you have agreed to rent.

That dwelling is: Unit # _____930_____ at

Tzadik Lone Oak Apartments DBA Lone Oak Apartments
_____ ,

(name of apartments)

or other dwelling located at _____

_____

(street address of house, duplex, etc.)

City/State where dwelling is located _____

**2. About Mold.** Mold is found everywhere in our environment, both indoors and outdoors and in both new and old structures. Molds are nothing new—they are natural microscopic organisms that reproduce by spores. They have always been with us. In the environment, molds break down organic matter and use the end product for food. Without molds we would be struggling with large amounts of dead organic matter. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing, and other materials. There is conflicting scientific evidence about how much mold must accumulate before it creates adverse health effects on people and animals. Even so, we must take appropriate precautions to prevent its buildup.

**3. Preventing Mold Begins with You.** To minimize the potential for mold growth in your dwelling, you must:

- Keep your dwelling clean—particularly the kitchen, bathroom, carpets, and floors. Regular vacuuming and mopping of the floors, plus cleaning hard surfaces using a household cleaner, are all important to remove the household dirt and debris that harbor mold or food for mold. Throw away moldy food immediately.

- Remove visible moisture accumulations on windows, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Look for leaks in washing-machine hoses and discharge lines—especially if the leak is large enough for water to seep into nearby walls. If your dwelling has them, turn on exhaust fans in the bathroom before showering and in the kitchen before cooking with open pots. Also when showering, keep the shower curtain inside the tub (or fully close the shower doors). Experts also recommend that after a shower or bath you (1) wipe moisture off shower walls, shower doors, the bathtub, and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

- Promptly notify us in writing about any air-conditioning or heating-system problems you discover. Follow any of our rules about replacing air filters. It's also good practice to open windows and doors periodically on days when the outdoor weather is dry (i.e., humidity is below 50%) to help humid areas of your dwelling dry out.

- Promptly notify us in writing of any signs of water leaks, water infiltration, or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation as necessary.

**4. Avoiding Moisture Buildup.** To avoid mold growth, it's important to prevent excess moisture buildup in your dwelling. Failing to promptly attend to leaks and moisture accumulations on dwelling surfaces can encourage mold growth, especially in places where they might get inside walls or ceilings. Prolonged moisture can come from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors, and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, sinks, washing machines, dehumidifiers, refrigerator or air-conditioner drip pans, or clogged air-conditioner condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting or caulking around showers, bathtubs, or sinks;

- washing-machine hose leaks, plant-watering overflows, pet urine, cooking spills, beverage spills, and steam from excessive open-pot cooking;

- leaks from clothes-dryer discharge vents (which can put a lot of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls, and bathroom floors.

**5. Cleaning Mold.** If small areas of mold have already accumulated on nonporous surfaces (such as ceramic tile, formica, vinyl flooring, metal, wood, or plastic), the Environmental Protection Agency recommends that you first clean the areas with soap (or detergent) and water and let the surface dry thoroughly. (Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.) When the surface is dry—and within 24 hours of cleaning—apply a premixed spray-on household biocide such as Lysol Disinfectant®, Original Pine-Sol® Cleaner, Tilex Mold & Mildew Remover® or Clorox® Clean-up® Cleaner + Bleach. (Note two things: First, only a few of the common household cleaners can actually kill mold. Second, Tilex and Clorox contain bleach, which can discolor or stain surfaces, so follow the instructions on the container.) Always clean and apply a biocide to an area five or six times larger than any mold you see—mold can be present but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be used to help remove nonvisible mold products from porous items such as fibers in sofas, chairs, drapes, and carpets—provided the fibers are completely dry. Machine washing or dry-cleaning will remove mold from clothes.

**6. Warning for Porous Surfaces and Large Surfaces.** Do not clean or apply biocides to visible mold on porous surfaces such as sheetrock walls or ceilings or to large areas of visible mold on nonporous surfaces. Instead, notify us in writing and we will take appropriate action to comply with Section 92.051 et seq. of the Texas Property Code, subject to the special exceptions for natural disasters.

**7. Compliance.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions about this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

---

**Resident or Residents** *(all sign below)*          **Owner or Owner's Representative** *(sign below)*

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

*Your are entitled to receive a copy of this Addendum after it is fully signed. Keep it in a safe place.*





## Security Guidelines for Residents
## Addendum

**1. Addendum.** This is an addendum to the Lease Contract ("Lease") executed by you, the resident(s), on the dwelling you have agreed to rent. That dwelling is:

Apt. # _____930_____ at Tzadik Lone Oak
Apartments DBA Lone Oak Apartments
_____
_____
(name of apartments)

or other dwelling located at _____
_____
_____
(street address of house, duplex, etc.)

City/State where dwelling is located _____
_____

**2. Security Guidelines. *We disclaim any express or implied warranties of security.*** We care about your safety and that of other occupants and guests. *No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. The best safety measures are the ones you perform as a matter of common sense and habit.*

Inform all other occupants in your dwelling, including any children you may have, about these guidelines. We recommend that all residents and occupants use common sense and follow crime prevention tips, such as those listed below:

- In case of emergency, call 911. Always report emergencies to authorities first and then contact the management.

- Report any suspicious activity to the police first, and then follow up with a written notice to us.

- Know your neighbors. Watching out for each other is one of the best defenses against crime.

- Always be aware of your surroundings and avoid areas that are not well-traveled or well-lit.

- Keep your keys handy at all times when walking to your car or home.

- Do not go inside if you arrive home and find your door open. Call the police from another location and ask them to meet you before entering.

- Make sure door locks, window latches and sliding glass doors are properly secured at all times.

- Use the keyless deadbolt on your unit when you are at home.

- Don't put your name or address on your key ring or hide extra keys in obvious places, like under a flower pot. If you lose a key or have concerns about key safety, we will rekey your locks at your expense, in accordance with paragraph 11 of the Lease.

- Check the door viewer before answering the door. Don't open the door if you don't know the person or have any doubts. Children who are old enough to take care of themselves should never let anyone inside when home without an adult.

- Regularly check your security devices, smoke alarms and other detection devices to make sure they are working properly. Alarm and detection device batteries should be tested monthly and replaced at least twice a year.

- Immediately report in writing (dated and signed) to us any needed repairs of security devices, doors, windows, smoke alarms and other detection devices , as well as any other malfunctioning safety devices on the property, such as broken access gates, burned out exterior lights, etc.

**Resident or Residents** *(all sign below)*          **Owner or Owner's Representative** *(sign below)*

_____          _____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

_____
(Name of Resident)

*Your are entitled to receive a copy of this Addendum after it is fully signed. Keep it in a safe place.*

TAA Official Statewide Form 15-M, Revised January, 2015
Copyright 2015, Texas Apartment Association, Inc.



LEASE ADDENDUM FOR CONCESSION, CREDIT OR OTHER DISCOUNT

**1. Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____ 930 _____ in the
Tzadik Lone Oak Apartments DBA Lone Oak Apartments

_____ Apartments in _____ Weatherford _____,
Texas **OR**
the house, duplex, etc. located at *(street address)* _____
_____ in _____, Texas.

**2. Concession or discount.** As an incentive and bonus to you for signing the TAA Lease Contract, choosing our property,
and agreeing to fulfill your obligations for the entire term of the TAA Lease Contract, you will receive a concession, credit or
discount described below. *[Check all that apply]*

☒ One-time concession. You will receive a one-time concession in the total amount of $ 2380.00 _____.
   This concession will be credited to your charges for the month(s) of to be given for the October and
   November 2023 months.

☐ Monthly discount. You will receive a monthly discount of $ _____ for _____ months.

Special Provisions: Any concessions received will be charged back to resident if lease is not
paid for entire term.

_____
_____
_____
_____
_____
_____
_____

**3. Payment or repayment for breach.** If you move out or terminate your TAA Lease Contract early, in violation of the TAA
Lease Contract, you forfeit the concession or credit received under this addendum.

If you fail to pay all of your obligations under the TAA Lease Contract, then you will be required to immediately repay us the
amounts of all concessions and/or discounts that you actually received from us for the months you resided in your dwelling,
in addition to all other sums due under the TAA Lease Contract for unauthorized surrender or abandonment by the resident
(see TAA Lease Contract Par. 27).

_____         _____
Signatures of All Residents                        Signature of Owner or Owner's Representative

_____
_____
_____
_____
_____

Texas Apartment Association

**LEASE ADDENDUM FOR TRASH REMOVAL AND RECYCLING COSTS—FLAT FEE**

**1. Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____930_____ in the

___Tzadik Lone Oak Apartments DBA Lone Oak Apartments___

_____ Apartments in _____Weatherford_____,

Texas **OR**

the house, duplex, etc. located at (street address) _____

_____ in _____, Texas.

**2. Flat fee for trash/recycling costs.** Your monthly base rent under the TAA Lease Contract does not include a charge
for trash removal. Instead, you will be receiving a separate bill from us for such service. You agree to pay a monthly fee of
$ _____7.50_____ for the removal of trash and/or recycling for the apartment community, plus a nominal administrative fee of
$ _____3.00_____ per month (not to exceed $3) for processing and billing.

Your trash/recycling bill may include state and local sales taxes as required by state law.

**3. Payment due date.** Payment of your trash removal and recycling bill is due 16 days after the date it is postmarked or hand
delivered to your apartment. We may include this item as a separate and distinct charge as part of a multi-item bill. You agree
to mail or deliver payment to the place indicated on your bill so that payment is received no later than the due date. There will
be a late charge of $ _____3.00_____ (not to exceed $3) if we do not receive timely payment of your trash/recycling bill, but
we are not obligated to accept late payment. If you are late in paying the trash removal/recycling bill, we may immediately
exercise all lawful remedies under your lease contract, including eviction.

_____          _____

Signatures of All Residents                                        Signature of Owner or Owner's Representative

_____

_____

_____

_____

_____

Texas Apartment Association

LEASE ADDENDUM REGARDING SMOKING

1. **Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____930_____ in the **Tzadik Lone Oak Apartments DBA Lone Oak Apartments** _____ Apartments in _____Weatherford_____, Texas **OR**

the house, duplex, etc. located at (street address) _____ in _____, Texas.

2. **Smoking,** in any form, anywhere inside any of the dwelling units, or inside any buildings within the apartment community, is strictly prohibited. This is our no-smoking policy; and you agree that any violation of the no-smoking policy is a material and substantial violation of this addendum and a breach of the TAA Lease Contract.

The prohibition of smoking extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the community. The no-smoking policy and rules extend to, but are not limited to, the leasing offices, building interiors and hallways, building common areas, dwelling units, club house, exercise or spa facility, indoor tennis courts, all interior areas of the community, commercial shops, businesses, work areas, and all other spaces whether in the interior of the community or in the enclosed spaces on community grounds. Smoking is also prohibited by this addendum inside any dwelling or building, whether leased by you or another.

3. **Smoking permitted in designated areas of the apartment community.** Smoking is permitted only in specially designated areas, if any. The permissible smoking areas are marked by signs.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling unit:

☐ is permitted

☒ is not permitted.

Only the following outside areas may be used for smoking: _____
_____
_____

Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least ___50___ feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees immediately cease smoking in those areas if smoke is entering a dwelling or building or if it is interfering with the rights, comfort, health, safety or convenience of others in or near the apartment community or rental premises.

4. **Your responsibility for damages and cleaning.** You are responsible for payment of all costs and damages to your dwelling unit, other residents' dwelling units, or any other portion of the community for repair, replacement, or cleaning and odor removal due to smoking or smoke-related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this addendum. You agree that any costs or damages we incur related to repairs, replacement, cleaning and odor removal due to your smoking or due to your violation of the no-smoking provisions of the TAA Lease Contract are NOT normal wear and tear. You also agree that smoke-related damage, including but not limited to smoke odor that permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling unit or building, shall always be in excess of normal wear and tear in our community and at the rental premises.

5. **Your responsibility for loss of rental income and economic damages regarding other residents.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke-related damages caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwelling units, results in disruption of other residents' enjoyment of the community, adversely affects other residents' or occupants' health, safety, or welfare, or causes a qualified applicant to refuse to rent the unit because of smoke related damages including smoke odors.

6. **Definition of smoking.** "Smoking" refers to, but is not limited to, any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

7. **Lease Contract termination for violation of this addendum.** We have the right to exercise all remedies available to us for any violation of this addendum, which in turn is a default under the Lease, which include terminating your right of occupancy and possession. Violation of this addendum is a material and substantial default of the TAA Lease Contract. In the event we terminate your right of occupancy, you shall remain liable for all rent and other sums due under the TAA Lease Contract subject to any duty to mitigate.

8. **Extent of your liability for losses due to smoking.** Your responsibility for damages, cleaning, deodorizing, loss of rental income, and other economic damages under this addendum are in addition to, and not instead of your responsibility for any other damages or loss under the TAA Lease Contract or any other addendum.

Texas Apartment Association

9. **Your responsibility for conduct of occupants, family members and guests.** You are responsible for communicating the no- smoking policy and provisions of this addendum to your occupants, family, guests, and invitees and understand that a failure on their part to comply is the same as non-compliance by you.

10. **No warranty of a smoke-free environment.** Although we prohibit smoking in all interior parts of the dwelling units and community, there is no warranty or guaranty that your dwelling unit, buildings or the community is smoke-free. Smoking in certain limited outside areas may be allowed as provided in this Addendum. Enforcement of our no-smoking policy is a joint responsibility that requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy to us before we are obligated to investigate and take action. You agree to cooperate with us if it becomes necessary to pursue action for any violations of the no-smoking policy.

This is an important and binding legal document. By signing this addendum you are acknowledging that a violation could lead to termination of your right of possession or your right to occupy the dwelling unit and premises. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this addendum. Before signing you must advise us whether you or anyone who will be living in your dwelling is a smoker. If you give an incorrect or false answer, you agree that is a default under the Lease. Provide your answer by checking one of the following boxes:

❑ Neither you nor anyone who will be living in the dwelling unit is a smoker and it is agreed no one will ever smoke in the unit.

❑ Someone who will be living in the dwelling unit is a smoker but it is agreed no one will ever smoke in the unit.

_____       _____
Signatures of All Residents                                    Signature of Owner or Owner's Representative

_____

_____

_____

_____

LEASE ADDENDUM ADDRESSING CARRYING FIREARMS ONSITE

**1. Addendum.** This is an addendum to the TAA Lease Contract for Apt. No. _____930_____ in the
Tzadik Lone Oak Apartments DBA Lone Oak Apartments
_____ Apartments in _____Weatherford_____,
Texas. The terms of this addendum will control if the terms of the Lease and this addendum conflict.

**2. Texas law.** Texas allows qualified people to carry a firearm in the state. However, we may restrict carrying firearms on our property, with the exception of transporting firearms from a vehicle to an apartment. If we provide notice of our policy restricting the carrying of firearms, and you do not comply, you will be in violation of the Lease and may be engaging in criminal trespass.

**3. Community firearm carry policy.** Whether or not you hold a license under the Texas handgun licensing law, by signing this addendum, you understand and agree as follows (the specific agreements are indicated by the options that are marked):

❑ Option 1: Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun. The only exception is that we allow persons to transport their firearms between their vehicles and their apartments.

❑ Option 2: Pursuant to Section 30.07, Penal Code (trespass by license holder with an openly carried handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a handgun that is carried openly. The only exception is that we allow persons to transport their firearms between their vehicles and their apartments.

☒ Option 3: Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter ☒ the leasing office or ☒ any common rooms/amenities of this property with a concealed handgun. (If neither is checked, concealed handguns are prohibited in both).

☒ Option 4: Pursuant to Section 30.07, Penal Code (trespass by license holder with an openly carried handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter ☒ the leasing office or ☒ any common rooms/amenities of this property with a handgun that is carried openly. (If neither is checked, openly carried handguns are prohibited in both).

❑ Option 5: Pursuant to Section 30.05, Penal Code (criminal trespass), a person may not enter this property with a firearm, other than to transport their firearm(s) between their vehicle(s) and their apartment(s), as long as firearms are not in plain view.

**4. General acknowledgment and agreement.** By signing this addendum, you acknowledge and agree that:

(a) you and your occupants and guests will adhere to any of our other policies concerning firearms as set forth in the Lease or any community policies we issue;

(b) you have been provided the apartment community's policy or policies concerning firearms and will follow them;

(c) you will inform all of your occupants or guests what the apartment community's policy or policies concerning firearms are and that they are subject to the same policy or policies as you;

(d) you understand that a violation of this addendum will be a violation of the Lease and could be considered criminal trespass under Texas law; and

(e) you will promptly provide written notice to us of any violations of our firearm or other weapons policies that you observe.

**5. Assumption of risk/waiver.** By signing this addendum and taking possession of the apartment, you acknowledge and agree that:

(a) we do not guarantee a gun-free environment at the apartment community and we cannot guarantee anyone's safety;

(b) no action or omission by us under this addendum may be considered a waiver of our rights, or of any subsequent violation, default, or time or place of performance, even if we have actual knowledge of, or have been provided with written notice of a violation;

(c) our efforts to restrict the carrying of handguns and/or firearms at the apartment community do not in any way enlarge, restrict or otherwise change the standard of care that we would have to you or any other household in the apartment community to render any areas in the apartment community any safer, more secure, or improved as compared to any other rental property;

(d) we disclaim any express or implied warranties that any part of the apartment community will have any higher or improved safety or security standards than any other rental property;

(e) we cannot and do not warrant or promise that any part of the apartment community is or will be free from handguns, firearms, or other weapons; and

(f) our ability to effectively monitor or enforce this addendum depends in large part on your and your occupants' and guests' cooperation and compliance.

_____          _____
Signatures of All Residents                                    Signature of Owner or Owner's Representative

_____

_____

_____

_____

_____

**Texas Apartment Association**

COMMUNITY POLICIES ADDENDUM

1. **Addendum.** This is an addendum to the Lease between you and us for Apt. No. _____ 930 _____ in the
Tzadik Lone Oak Apartments DBA Lone Oak Apartments
_____ Apartments in _____ Weatherford _____,
Texas **OR**

the house, duplex, etc. located at (street address) _____
_____ in _____, Texas.

2. **Payments.** All payments for any amounts due under the Lease must be made:

☒ at the onsite manager's office

☒ through our online portal

☒ by mail to Lone Oak Apartments 1801 Fort Worth Highway, Weatherford TX 76-86 _____, or

☐ other: _____.

The following payment methods are accepted:

☒ electronic payment

☒ personal check

☒ cashier's check

☒ money order, or

☒ other: www.rentloneoak.com _____.

We have the right to reject any payment not made in compliance with this paragraph.

3. **Security Deposit Deductions and Other Charges.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing alarm or detection-device batteries at any time; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone, Internet, television services, or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; packing, removing, or storing property removed or stored under the Lease; removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges outlined in the Lease; government fees or fines against us for violation (by you, your occupants, or your guests) of local ordinances relating to alarms and detection devices, false alarms, recycling, or other matters; late-payment and returned-check charges; and other sums due under this Lease. You'll be liable to us for charges for replacing any keys and access devices referenced in the Lease if you don't return them all on or before your actual move-out date; and accelerated rent if you've violated the Lease. *We may also deduct from your security deposit our reasonable costs incurred in rekeying security devices required by law if you vacate the apartment in breach of this Lease.*

Upon receipt of your move-out date and forwarding address in writing, the security deposit will be returned (less lawful deductions) with an itemized accounting of any deductions, no later than 30 days after surrender or abandonment, unless laws provide otherwise. Any refund may be by one payment jointly payable to all residents and distributed to any one resident we choose or distributed equally among all residents.

4. **Requests, Consent, Access and Emergency Contact.** All written requests to us must be submitted by:

☒ online portal

☒ email to manager@rentloneoak.com _____

☒ hand delivery to our management office, or

☐ other: _____.

From time to time, we may call or text residents with certain promotional or marketing messages that may be of interest. By signing this form and providing contact information, you are giving us your express written consent to contact you at the telephone number you provided for marketing or promotional purposes, even if the phone number you provided is on a corporate, state or national Do Not Call list. **To opt out of receiving these messages, please submit a written request to us by the method noted above.**

**You agree to receive these messages from us through an automatic telephone dialing system, prerecorded/artificial voice messages, SMS or text messages, or any other data or voice transmission technology. Your agreement is not required as a condition of the purchase of any property, goods, or services from us.**

Any resident, occupant, or spouse who, according to a remaining resident's affidavit, has permanently moved out or is under court order not to enter the apartment, is (at our option) no longer entitled to occupancy or access devices, unless authorized by court order.

*After-hours phone number* (214) 807-3603
(Always call 911 for police, fire, possible criminal activity or medical emergencies.)

5. **Parking.** We may have any unauthorized or illegally parked vehicles towed or booted according to state law at the owner or operator's expense at any time if the vehicle: (a) has a flat tire or is otherwise inoperable; (b) is on jacks, on blocks, or has a wheel missing; (c) takes up more than one parking space; (d) belongs to a resident or occupant who has surrendered or abandoned the apartment; (e) is in a handicapped space without the legally required handicapped insignia; (f) is in a space marked for office visitors, managers, or staff; (g) blocks another vehicle from exiting; (h) is in a fire lane or designated "no parking" area; (i) is in a space that requires a permit or is reserved for another resident or apartment; (j) is on the grass, sidewalk, or patio; (k) blocks a garbage truck from access to a dumpster; (l) has no current license or registration, and we have given you at least 10 days' notice that the vehicle will be towed if not removed; or (m) is not moved to allow parking lot maintenance.

6. **HVAC Operation.** If the exterior temperature drops below 32° F you must keep the heat on and set to a minimum of 50° F. You must also open all closets, cabinets, and doors under sinks to assist in keeping plumbing fixtures and plumbing pipes from freezing, and you must drip all the faucets in your apartment using both the hot and cold water. Leave the faucets dripping until the exterior temperature rises above 32° F. You must leave your HVAC system on, even if you leave for multiple days, and have it set to auto at all times.

7. **Amenities.** Your permission for use of all common areas, amenities, and recreational facilities (collectively "Amenities") located at the property is a license granted by us. This permission is expressly conditioned upon your compliance with the terms of the Lease, the Community Policies, and any signage posted in or around any of the Amenities. We have the right to set the days and hours of use for all Amenities and to change those or close any of the Amenities based upon our needs. We may make changes to the rules for the use of the Amenities at any time.

   *Neither we nor any of our agents, employees, management company, its agents, or its employees shall be liable for any damage or injury that results from the use of any Amenities by you, your invitees, your licensees, your occupants, or your guests. This release applies to any and all current, past or future claims or liability of any kind related to your decision to use the Amenities.*

8. **Package Services.** We ☐ do or ☒ do not accept packages on behalf of residents.

   If we DO accept packages, you give us permission to sign and accept any parcels or letters you receive through UPS, Federal Express, Airborne, United States Postal Service or other package delivery services. You agree that we are not liable or responsible for any lost, damaged or unordered deliveries and will hold us harmless.

9. **Fair Housing Policy.** We comply with applicable fair housing laws. In accordance with fair housing laws, we'll make reasonable accommodations to our rules, policies, practices or services and allow reasonable modifications to give disabled persons access to and use of the dwelling and common areas. We may require you to sign an addendum regarding the implementation of any accommodations or modifications, as well as your restoration obligations, if any. This fair housing policy does not expand or limit any rights and obligations under applicable law.

10. **Special Provisions.** The following special provisions control over conflicting provisions of this form:

---

_____

Signature of All Residents

_____

Signature of Owner or Owner's Representative

Texas Apartment Association

# Blue Moon Lease - Lone Oak Apartments

## Signature Details

| | Signer | IP Address | Date Signed |
|---|---|---|---|
| **1** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:54:05 PM |
| **2** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:54:20 PM |
| **3** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:54:34 PM |
| **4** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:54:49 PM |
| **5** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:55:03 PM |
| **6** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:55:30 PM |
| **7** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:55:46 PM |
| **8** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:56:04 PM |
| **9** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:56:16 PM |
| **10** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:56:33 PM |
| **11** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:56:49 PM |
| **12** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:57:03 PM |
| **13** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:57:15 PM |
| **14** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:57:30 PM |
| **15** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:57:46 PM |
| **16** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:57:59 PM |
| **17** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:58:16 PM |
| **18** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:58:28 PM |
| **19** | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:58:40 PM |

| 20 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:59:01 PM |
|---|---|---|---|
| 21 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:59:17 PM |
| 22 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:59:41 PM |
| 23 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 05:59:56 PM |
| 24 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 06:00:11 PM |
| 25 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 06:00:26 PM |
| 26 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 06:00:45 PM |
| 27 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 06:01:10 PM |
| 28 | **Yvonne A Reed**<br>Primary (15874796) | 172.59.195.158 | 10/02/2023 06:01:32 PM |
| 29 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 30 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 31 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 32 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 33 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 34 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 35 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 36 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 37 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 38 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 39 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 40 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |

| 41 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
|---|---|---|---|
| 42 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 43 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 44 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 45 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 46 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 47 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 48 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 49 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 50 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 51 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 52 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 53 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 54 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 55 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |
| 56 | **Sandey Sawyer**<br>Owner/Manager | 2600:1700:bd8:4050:84b8 | 10/02/2023 06:02:56 PM |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

Division 4

Yvonne Reed
Plaintiff

v.

Civil Action No.

Cleigh Ryan Voorhees/FWH Apartments LLC
Defendant

## COMPLAINT

I'm filing this complaint due to a violation of Title VIII of the 1968 Civil Rights Act. I was discrimated against because of my race and my age. I was a resident of the Lone Oak Apartments located at 1801 Lone Oak Rd Weatherford, TX 76086 with an effective date of 09/30/2023. I signed my lease on 09/30/2023 and can provide a copy of the lease. I was sexually assaulted in my apartment while I was asleep. This was an inside job. There were no signs of foreced entry. However, the rapist got me pregnant as a result of the rape. I did report this incident to the police. I advised the police that I had not given the key to anyone or invited anyone into my home. I lived alone and was not romantically involved with anyone. I advised the police that the apartment personnel had given the rapist access to my apartment to come and rape me. I did move out of these apartments on 05/02/2023 as a result of the rape and not feeling safe to live there anymore. I strongly believe that the previous apartment manager Sandy Sawyer was responsible for giving the rapists access to my apartment. I spoke with the apartment manager Sandy Sawyer by phone about the rape incident on 02/15/2024 around 3 pm in the afternoon. The apartment manager stated that she would have the courtesy officer reach out to me. However, several days went by and there was no action taken on my behalf. Which lead me to believe that she was aware of the incident or took part in the incident. She was replaced by the assitant manager Claudia Mota. I took the intiative and reached out to Freedom House, a non profit for rape victims. I spoke to them about the rape and they put me in contact with the police. I'm requesting relief in the amount of $3,000,000.

\* Attach additional pages as needed.

| | |
|---|---|
| Date | 6-20-2024 |
| Signature | *Yvonne Reed* |
| Print Name | Yvonne Reed |
| Address | 6828 Joelene Rae Drive |
| City, State, Zip | Arlington, TX 76086 |
| Telephone | 470-992-3082 |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

Division 4

Yvonne Reed
Plaintiff

v.

Civil Action No.

Cleigh Ryan Voorhees/FWH Apartments LLC
Defendant

## COMPLAINT

I'm filing this complaint due to a violation of Title VIII of the 1968 Civil Rights Act. I was discrimated against because of my race and my age. I was a resident of the Lone Oak Apartments located at 1801 Lone Oak Rd Weatherford, TX 76086 with an effective date of 09/30/2023. I signed my lease on 09/30/2023 and can provide a copy of the lease. I was sexually assaulted in my apartment while I was asleep. This was an inside job. There were no signs of foreced entry. However, the rapist got me pregnant as a result of the rape. I did report this incident to the police. I advised the police that I had not given the key to anyone or invited anyone into my home. I lived alone and was not romantically involved with anyone. I advised the police that the apartment personnel had given the rapist access to my apartment to come and rape me. I did move out of these apartments on 05/02/2023 as a result of the rape and not feeling safe to live there anymore. I strongly believe that the previous apartment manager Sandy Sawyer was responsible for giving the rapists access to my apartment. I spoke with the apartment manager Sandy Sawyer by phone about the rape incident on 02/15/2024 around 3 pm in the afternoon. The apartment manager stated that she would have the courtesy officer reach out to me. However, several days went by and there was no action taken on my behalf. Which lead me to believe that she was aware of the incident or took part in the incident. She was replaced by the assitant manager Claudia Mota. I took the intiative and reached out to Freedom House, a non profit for rape victims. I spoke to them about the rape and they put me in contact with the police. I'm requesting relief in the amount of $3,000,000.

\* Attach additional pages as needed.

| | |
|---|---|
| Date | 6-20-2024 |
| Signature | *[signature]* |
| Print Name | Yvonne Reed |
| Address | 6828 Joelene Rae Drive |
| City, State, Zip | Arlington, TX 76086 |
| Telephone | 470-992-3082 |



CERTIFIED MAIL

9589 0710 5270 1954 1664 12

U.S. POSTAGE PAID
FCM LG ENV
WEATHERFORD, TX 76086
JUN 21, 2024

76102    $9.07

RDC 99    S2324D500239-11

United States District Court
Division 4
501 West 10th street Room 310
Ft. North, Texas 76102

RECEIVED
JUN 26 2024
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS